THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DENISE PAYNE, Defendant-Appellant.

First District (6th Division)  No. 1—00—4120

Opinion filed December 20, 2002.

Michael J. Pelletier and Elizabeth A. Botti, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb and John E. Nowak, Assistant State's Attorneys, of counsel), for the People.

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Following a bench trial, defendant Denise Payne was convicted of first degree murder. The State sought the death penalty and defendant waived a jury for both phases of the capital sentencing hearing. After a death penalty hearing before the trial court, defendant was sentenced to an extended term of 80 years in prison. Defendant appealed and her counsel filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738, 18 L. Ed. 2d 493, 87 S. Ct. 1396 (1967). Defendant responded, contending that the State did not prove she had the intent to kill beyond a reasonable doubt. Rejecting defendant's contention, this court granted defense counsel's motion to withdraw and affirmed the trial court's judgment. *People v. Payne*, No. 1—97—4467, slip order at 2-3 (August 23, 1999) (unpublished order under Supreme Court Rule 23) ("the evidence was sufficient to show that defendant

possessed the requisite intent and committed the offense of first degree murder'').

Defendant subsequently filed a *pro se* postconviction petition, which the circuit court summarily dismissed as frivolous and patently without merit. In this appeal, defendant contends (1) that her *pro se* petition sufficiently raised the gist of a meritorious claim of ineffective assistance of trial counsel; (2) that appellate counsel was ineffective; (3) that her extended-term sentence is unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000); and (4) that Public Act 83—942, effective November 23, 1983, violates the single subject clause of the Illinois Constitution (Ill. Const. 1970, art. IV, § 8(d)). We affirm.

## BACKGROUND

Defendant's conviction arose from the beating death of her five-year-old stepson, J.P., on February 21, 1995, in Harvey, Illinois. Defendant filed a motion to suppress statements, arguing that her confession was involuntarily obtained as a result of psychological coercion. Following a hearing, at which the interrogating officer and defendant's sister testified, the trial court denied the motion to suppress.

At trial, Harvey police detective James McGee testified that in the late evening hours of February 21, 1995, he was dispatched to an area hospital in connection with a reported incident of child abuse. At the emergency room, he observed J.P., who was unconscious with bruises, scars, marks, lacerations, and cuts ''all about'' his body. Detective McGee then went to J.P.'s home, where he spoke with defendant, who appeared calm and unconcerned. Defendant told Detective McGee that as she and J.P. were walking down the stairs, she slipped on the third stair from the bottom and landed on top of J.P. After further conversation, defendant told Detective McGee that she punished J.P. by striking him with a stick, which Detective McGee recovered from under the kitchen table. Defendant agreed to accompany Detective McGee to the hospital. There, Detective McGee spoke with medical personnel while defendant stayed in the emergency room waiting area. Defendant subsequently accompanied Detective McGee to the police department. The next afternoon, Detective McGee searched defendant's home with her husband's consent and recovered a leather belt.

J.P.'s sister, 11-year-old D.P., testified that on February 21, 1995, she was nine years old. She explained that at that time, she lived with her father, her stepmother, her eight-year-old sister, her six-year-old brother, and J.P., who was five years old. D.P. testified that on the day in question she heard defendant ask J.P. whether he had any

homework. J.P. responded that he did not. Defendant and J.P. went upstairs to the boys' room, where defendant again asked J.P. about his homework. When J.P. said he had none, defendant accused him of lying. Defendant then asked the children who broke the closet door in the boys' room, and D.P. told her that her niece had done it. Defendant telephoned her sister and then called J.P. downstairs. D.P. testified that she heard J.P. walk downstairs and then heard him "getting a whooping" with the belt. D.P. heard smacking noises and heard J.P. screaming and hollering, "Please, God." When asked whether J.P.'s screaming was any different that day from any other time, she replied that he was louder than ever before.

On cross-examination, D.P. stated that other than the day in question, every time she "got a whooping," defendant would say to her, "I'm going to kill you." D.P. also stated that defendant "used to say that all the time." However, D.P. acknowledged that she did not tell the police about these statements by defendant.

Paramedic Geral Kurylo testified that around 11:30 p.m. on the date in question, she and her partner were dispatched to defendant's home. When Kurylo entered the home, defendant was talking on the telephone, crying, and holding J.P. in her arms. She then set J.P. down on the kitchen table, promptly stopped crying, and lit a cigarette. Kurylo testified that J.P. was limp and chalky white, which indicated he had been without oxygen for some length of time, and had chunky vomit around his face. The paramedics asked defendant what happened, and she replied that J.P. was sitting on the sofa coughing, and then all of a sudden he just quit coughing and stopped breathing. After determining that J.P. was not breathing and had no pulse, Kurylo picked J.P. up and told defendant they were going to the hospital. When Kurylo asked defendant whether she was coming, defendant said she could not.

In the ambulance on the way to the hospital, Kurylo noticed that J.P. had black marks on his neck about the width of a finger and other marks all over his body. J.P.'s left arm was swollen and discolored from the top of his shoulder to his elbow. At the hospital, Kurylo noticed that J.P. had "many, many wounds" across his back and buttocks in different stages of healing, injuries to the bottoms of his feet, and what appeared to be bite marks on his side and the back of his thighs.

On cross-examination, Kurylo acknowledged that in her narrative she wrote, "Assorted wounds over child's body, arms and fingers," but did not specify the nature or location of the wounds and did not mark J.P.'s injuries on the illustration of the human figure. She also did not note that J.P. was chalky white.

The parties stipulated that, if called to testify, Dr. Allswede would

have testified that J.P. arrived at the Ingalls Hospital emergency room in full cardiorespiratory arrest, was comatose, and did not respond to verbal or painful stimulation. After examining J.P., Dr. Allswede found whip marks of various ages on his thighs, arms, and front and back torso; bruises and abrasion to his chest, back, and left arm; blistering on his fingertips; a laceration to the right lower lip; fresh bruises and abrasions to both flanks; bruises to the left neck; and an abrasion and a hematoma to the left eye socket. Based on his medical training, education, and experience, Dr. Allswede would have testified that J.P.'s injuries were the result of child abuse.

The parties stipulated that on February 22, 1995, J.P. was transferred via helicopter to Wyler's Children's Hospital and arrived in a comatose state on an intubator. Bruises, lacerations, hematomas, abrasions, and cord marks were noted by doctors at Wyler's Children's Hospital, and a CT scan revealed severe brain injury with massive edema. The parties further stipulated that, if called to testify, Dr. Chaney would have testified that based on her medical training, education, and experience, it was her opinion that J.P.'s injuries were the result of child abuse. Finally, the parties stipulated that J.P. was pronounced dead at 7:33 a.m.

Assistant State's Attorney Frank Cece testified that in connection with the investigation of J.P.'s death, he spoke with Detective McGee, Dr. Allswede, the medical examiner's office, and J.P.'s siblings on February 22, 1995. Cece then spoke with defendant in an interview room at the police station. Cece introduced himself, asked whether defendant was under the influence of alcohol or drugs, and advised her of her constitutional rights. Cece and defendant then talked about what happened with J.P., and Cece reduced defendant's statement to writing.

Defendant related that she was the parent who would discipline the children, mainly for lying, and that although she usually used a belt on them, for the last couple of weeks she had been using a stick that was a piece of wall trim. Defendant related that after dinner on February 21, 1995, she went upstairs to the boys' room and found it "all in a wreck." Defendant found J.P.'s homework under his pillow. Earlier, J.P. had told defendant he did not have any homework. When defendant asked the children who broke the closet door, they first blamed each other, and then blamed their cousin. Defendant telephoned her sister and learned that her children denied breaking the door. Defendant stated, "That's when I went and got the stick."

Defendant related in her statement that she asked J.P. why his homework was not done and why he lied about not having any homework. When J.P. said he did not know or that he forgot, defendant

told him "to get his ass into the dining room," where they started on his homework. Defendant told Cece that she would point to letters and ask J.P. what they were, but J.P. kept saying that he had forgotten them. Defendant related:

"When [J.P.] told me that he forgot, that's when I hit him with the stick on his shoulder and on his back real hard.

[J.P.] had taken off his shirt and pants before I started hitting him, because I told him to. That way [J.P.] would feel the pain when I hit him. After I started hitting [J.P.], he told me the right letters. [J.P.] would keep forgetting the pictures and the letters, so every time he forgot, I would keep hitting [J.P.] all over his body. I would hit him with the stick, and he kept jumping around and moving, but he never ran away, because he knew better.

I hit [J.P.] all over his back, shoulders, arms, butt, legs, face and head with the stick. [J.P.] kept crying saying, 'Okay, okay, mama, I won't do it anymore,' but I kept hitting him because he needed to be punished. When I got through with [J.P.] his whole body was red. His lip was bleeding."

Defendant told Cece that by 9:30 p.m., all the kids were in bed. Some time later, defendant noticed that J.P. was breathing funny. She took J.P. downstairs and got some water, and when she returned, J.P. had stopped breathing. Defendant tried to perform cardiopulmonary resuscitation (CPR) and then called for an ambulance. Defendant noted her husband knew she disciplined the children with the belt and the stick and stated, "He even told me that when I used to hit the kids with an extension cord, it was excessive." Defendant concluded by saying, "I want to say that I know I went too far in whooping [J.P.]"

Dr. Simms, the deputy medical examiner who performed J.P.'s autopsy, testified that he observed a total of 9 injuries in the area of J.P.'s head and neck, 15 marks on his back and buttocks, 7 injuries on his abdomen, and 46 marks on his extremities. These external injuries ranged in age from a few weeks to a few hours old. Dr. Simms indicated that some of the marks were consistent with being made by fingernails, while others were consistent with being made by a belt or wooden stick, as defendant admitted to using.

Dr. Simms identified 29 photographs as accurately depicting J.P.'s injuries. Dr. Simms noted that J.P.'s back and left upper arm were swollen. He described the complex loop scar on the back of J.P.'s left thigh as the size and thickness of a coat hanger. He stated that the multiple linear and curvilinear scratches on the back of J.P.'s left upper arm were consistent with fingernail scratches or injuries caused by someone holding his arm, and that the injuries to J.P.'s fingertips

could be consistent either with J.P. striking out and fighting with his hands, or with blunt trauma inflicted onto the fingertips. Dr. Simms explained that the linear wounds were inflicted with some kind of rod-shaped instrument, that he believed some of the curvilinear wounds were inflicted by fingernails, and that he could not tell what inflicted the other curvilinear wounds. He stated that the loop-shaped wounds were caused by a belt or some other type of pliable instrument, and that the angled scars would have been caused by a fairly hard object such as the edge of a piece of wood or a belt buckle. When shown the stick and belt Detective McGee recovered from defendant's home, Dr. Simms agreed that the linear and angled wounds on J.P.'s body were consistent with being struck with those objects. Dr. Simms testified that many of J.P.'s injuries could be characterized as pattern injuries, which indicated that they were inflicted intentionally, as opposed to accidentally.

Dr. Simms further testified that he conducted an internal examination of J.P. He observed a large area of contusion on the back of the head, indicating a fresh hemorrhage. J.P.'s brain was swollen to the point that it had pushed through the opening at the bottom of the skull and put pressure on the brain stem where the breathing and heart centers are located. Dr. Simms stated that when the brain herniates through the opening at the base of the skull and puts pressure on the brain stem, it usually causes death. Dr. Simms noted multiple hemorrhages on J.P.'s tongue and a hemorrhage in the neck near the thyroid gland, which indicated that pressure was applied or trauma was inflicted in the area of the windpipe. He stated that taken together with the external injuries to J.P.'s neck, the hemorrhages on J.P.'s tongue and neck indicated that he had been strangled.

Dr. Simms observed a large amount of hemorrhage in J.P.'s left chest, fourth rib on the left side, back, buttocks, abdomen, and muscles surrounding the kidney. Dr. Simms found a "tremendous amount" of hemorrhage in the upper back and the upper arms, which accounted for the external swelling of J.P.'s back and left upper arm. Dr. Simms stated that a broad area of hemorrhage is consistent with repetitive beating with a significant amount of force. He also stated that taking into account the area of hemorrhage all over J.P.'s back, the hemorrhage on the back of his head, and the bruises on the upper parts of both his arms, he believed J.P. had been repetitively battered against a wall or a floor. J.P.'s brain swelling may have been caused by lack of oxygen due to strangulation, or by the trauma of his head repeatedly accelerating and then suddenly stopping as it was struck against a surface. Finally, Dr. Simms stated that the manner of J.P.'s death was homicide, with the cause being multiple injuries due to blunt force

trauma due to child abuse, with strangulation as a significant contributing condition.

Defendant testified as to the circumstances leading up to J.P.'s beating on February 21, 1995. She testified that shortly before that date, her mother had passed away. This was very traumatic for defendant, as the two women had been best friends despite the fact that when defendant was a child, her mother had been a strict disciplinarian who beat her with pop bottles, cast-iron skillets, shoes, and books. Defendant stated that in 1995, she was drinking a gallon of whiskey per week and was taking prescription drugs for diabetes and hypertension. On February 21, 1995, defendant's sister, her sister's four children, and her sister's boyfriend had been visiting, and all eight children had been running around the house. Defendant was also worried about whether her husband was going to bring his paycheck home. Defendant described it as "a stressful, exhaustive day."

Defendant acknowledged that she told the police she disciplined the children on the night in question. She insisted that she did not at any time intend to kill J.P. She also denied grabbing J.P. by the throat and choking him. When shown the stick that Detective McGee recovered from her house, defendant described it as roughly two feet long and about the thickness of a fingertip. She stated that the stick reminded her of a ruler her mother used to whip her. Finally, defendant explained that she stopped crying when the paramedics arrived at her house because it was not her habit to let people see her cry.

On cross-examination, defendant stated that she believed she was a good parent and that part of her responsibility as a good parent was discipline. She acknowledged that she used the stick recovered by Detective McGee as an instrument of discipline, but denied having hit the children with an extension cord. Defendant stated that she intentionally beat J.P. with the stick and the belt. She also said that she "had hold of him," although she did not remember where she had grabbed him. Defendant stated that J.P. was disrobed because he was about to take a bath, that he was crying, and that he tried to get away from her. Defendant testified that she was angry and was not thinking clearly because J.P.'s "room was tore up. He had defecated in the closet again. He was just generally misbehaving."

In response to questioning by the trial court, defendant stated that she drank about four shots of whiskey about an hour or two before the incident. She denied having hit J.P.'s head against the wall, the floor, or any other object. Finally, defendant stated that the only time she put her hand on J.P.'s throat was when she was trying to resuscitate him.

Following closing arguments, the trial court found defendant guilty of first degree murder. The State sought the death penalty, and defendant waived a jury for both phases of the capital sentencing hearing. After being presented with the presentence investigation report and hearing the testimony of several witnesses, the parties' stipulations as to other witnesses' testimony, a victim impact statement, and the attorneys' arguments, the trial court found defendant eligible for the death penalty because J.P. was under 12 years old and J.P.'s death resulted from exceptionally brutal and heinous behavior indicative of wanton cruelty. The trial court declined to impose the death penalty because defendant did not have a significant criminal background, defendant was beaten by her mother as a child, and defendant "was operating under a high degree of stress at the time of this beating." Noting that "[t]his is perhaps one of the worst beating cases, if not the worst beating case I have ever observed," the trial court imposed an extended-term sentence of 80 years in prison based on its finding that the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty.

## ANALYSIS

■ Under the Post-Conviction Hearing Act (Act), a defendant may collaterally challenge his or her conviction or sentence for violations of federal or state constitutional rights. 725 ILCS 5/122—1 *et seq.* (West 1998); *People v. Tenner*, 175 Ill. 2d 372, 377 (1997). A petition for post-conviction relief must "clearly set forth the respects in which petitioner's constitutional rights were violated" and "shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122—2 (West 1998). Any claim of substantial denial of constitutional rights that is not raised in the original or an amended petition is waived. 725 ILCS 5/122—3 (West 1998). Issues that were raised and decided on direct appeal are barred by the doctrine of *res judicata*, and issues that could have been raised on appeal, but were not, are deemed waived. *People v. Mahaffey*, 194 Ill. 2d 154, 170 (2000).

■ In cases where the death penalty is not involved, adjudication of a postconviction petition follows a three-stage process. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). The instant case was before the circuit court at the first stage of this process. In the first stage, the circuit court is required to review the petition within 90 days of its filing and determine whether it is frivolous or patently without merit. 725 ILCS 5/122—2.1(a)(2) (West 1998). The circuit court's review at this point is independent, as the Act does not permit any further pleadings from the defendant or any motions, responsive pleadings, or

other input from the State at the first stage. *Gaultney*, 174 Ill. 2d at 418; *People v. Montgomery*, 327 Ill. App. 3d 180, 183 (2001). To survive first-stage dismissal, a petition need only present the gist of a constitutional claim. *People v. Edwards*, 197 Ill. 2d 239, 244 (2001).

During first-stage review, the circuit court must determine whether the postconviction petition alleges a constitutional infirmity which, if proven, would necessitate relief under the Act. *People v. Coleman*, 183 Ill. 2d 366, 380 (1998). The first stage of postconviction review presents a pleading question. *Montgomery*, 327 Ill. App. 3d at 183. All well-pleaded facts that are not positively rebutted by the record are taken as true, and due to the elimination of all factual issues, a first-stage dismissal is subject to *de novo* review. *Coleman*, 183 Ill. 2d at 385, 388-89.

At the first stage, the court may examine the transcripts, the court file of the proceeding in which the defendant was convicted, and any action taken by an appellate court in such a proceeding. 725 ILCS 5/122—2.1(c) (West 1998). The court reviews these records in order to determine whether the well-pleaded facts included in the petition are positively rebutted by the record, thereby rendering the petition frivolous or patently without merit. *Montgomery*, 327 Ill. App. 3d at 184.

## I. Ineffective Assistance of Trial Counsel

In her *pro se* petition for postconviction relief, defendant alleged as follows:

> "Petitioner was denied effective assistance of counsel as required by the 6th amendment. Petitioner's trial counsel fell below standard for effective assistance of counsel. During Petitioner's statement hearing counsel failed to establish all evidence of coercion, that was available to be presented in the court. Counsel did not inform the court of Petitioner's limited education, the circumstances in which Petitioner signed statement such as the [e]ffects of her illness and the length of time she was in police custody. These are things that the Petitioner asserts caused her to make and sign the police statement."

Defendant argues that trial counsel was deficient in not establishing that the circumstances of the police interrogation, defendant's limited education, and her hypertension and diabetes could have induced her into confessing or otherwise prevented her from having the capacity to understand the meaning and effect of her confession. Defendant contends that her petition raised the gist of a meritorious claim that trial counsel was ineffective for failing to present sufficient evidence of the involuntariness of her confession.

The Act mandates that a postconviction petition "shall have at-

tached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122—2 (West 1998). The failure to either attach the necessary "affidavits, records, or other evidence" or explain their absence is fatal to a postconviction petition and by itself justifies summary dismissal. *People v. Collins*, 202 Ill. 2d 59, 66 (2002). Defendant's own sworn verification is not a substitute for the "affidavits, records, or other evidence" required by the Act. *Collins*, 202 Ill. 2d at 67. Here, defendant's petition was unsupported by attached affidavits, records, or other evidence and offered no explanation for the absence of such documentation. Accordingly, summary dismissal was proper.

Defendant argues that the lack of attached affidavits, records, or other evidence and the lack of an explanation for their absence is not fatal to her petition. She offers two reasons for this conclusion. First, defendant argues that she was not required to attach documentation because the record supports her claim of ineffectiveness. Specifically, defendant notes that the presentence investigation report indicates she earned only one-half of a credit in high school, suffered from diabetes and hypertension, and was prone to headaches and depression.

We have examined the record and find that it actually refutes defendant's claims of ineffectiveness. The record reveals that contrary to defendant's allegation in her *pro se* petition, trial counsel did inform the trial court of the "[e]ffects of her illness and the length of time she was in police custody." Moreover, in the written motion to suppress, counsel alleged that the interrogating officer, Detective McGee, told defendant that if she wanted her medicine, she had to sign a statement, and that it "was in this weakened, and psychologically stressed condition that defendant made, and signed statements against herself." During opening statements at the hearing on the motion, counsel informed the trial court that defendant suffered from hypertension and diabetes, and alleged that defendant asked the police for her medication both at the hospital and in the interview room at the police station. Counsel further claimed that Detective McGee told defendant she would have to talk with them if she wanted her medication and that "with her need for her medication she [made] a statement." Defense counsel concluded his opening statements by arguing that defendant "did not sign that confession or make it freely and voluntarily because *** she was in need of her medication." In the course of questioning Detective McGee, defense counsel elicited testimony that defendant was in "the lockup" from 2 a.m. until 8 p.m. and her statement was elicited around 8 p.m. Defense counsel then questioned defendant's sister, eliciting testimony that defendant was a

diabetic and had high blood pressure. During closing statements at the hearing, counsel repeatedly argued that defendant confessed because she needed her medicine.

With regard to defendant's argument regarding her "limited education," we acknowledge that counsel did not inform the court of defendant's level of education and that the presentence investigation report indicates that defendant earned only one-half of a credit in high school. However, statements made by defendants with a ninth-grade education, or less, have been found voluntary in Illinois. See, *e.g.*, *People v. Golden*, 323 Ill. App. 3d 892 (2001) (defendant was in ninth grade); *People v. Kolakowski*, 319 Ill. App. 3d 200 (2001) (defendant was 13 years old and reading at eighth-grade level); *People v. Saunders*, 307 Ill. App. 3d 406, 409 (1999) ("the last time [the defendant] had regularly attended school was in eighth grade"). These cases rebut defendant's claim that defense counsel was ineffective for failing to challenge the voluntariness of her confession based on her limited education.

We further note that the record contains a report from a psychologist concluding that, at the time of her arrest and questioning, defendant was competent to understand and waive her constitutional rights under *Miranda*. The record contains a subsequent report from a psychiatrist concluding that defendant "has an adequate understanding of her *Miranda* rights, and is competent to waive those rights." Although the issue of whether a confession was voluntary is distinct from the issue of whether a waiver of *Miranda* rights was knowing and intelligent, the review of both issues includes many of the same factors, such as the individual's mental ability, familiarity with the language, age, education, and experience. *In re M.W.*, 314 Ill. App. 3d 64, 69 (2000).

Defendant's allegations regarding trial counsel's ineffectiveness are positively rebutted by the record. In such situations, summary dismissal is appropriate. *People v. Rogers*, 197 Ill. 2d 216, 222 (2001). We reject defendant's argument that since the record supported her claim of ineffectiveness, her failure to attach supporting documentation to her postconviction petition or explain its absence was not fatal to her petition. The circuit court's decision to summarily dismiss defendant's *pro se* postconviction petition was proper.

■ We also reject defendant's second argument in support of her claim that her failure to attach supporting documentation or explain its absence is not fatal to her petition. Defendant contends that *Collins* does not require attached documentation or an explanation of its absence where, as in her case, it would have been virtually impossible to obtain an affidavit from trial counsel acknowledging his incompe-

tence. Relying on *People v. Williams*, 47 Ill. 2d 1, 4 (1970), defendant asserts, "The difficulty or impossibility of obtaining such an affidavit is self-apparent." Defendant argues that, due to this difficulty, "the explanation for the lack of corroborating evidence or affidavits can be inferred from the facts alleged" in the petition.

We disagree.

In *Collins*, the only attachment to the petition was the defendant's sworn verification. *Collins*, 202 Ill. 2d at 62. Despite the fact that the only other likely witness to the conversation alleged in the petition regarding defendant's intention to appeal the case was the very attorney that the defendant was claiming had been ineffective, the supreme court held that summary dismissal was justified because the petition was unsupported by "affidavits, records, or other evidence" and offered no explanation for the absence of such documentation. *Collins*, 202 Ill. 2d at 66.

The *Collins* court acknowledged that in some cases, such as *Williams*, the requirement of attaching affidavits, records, or other evidence would place an unreasonable burden upon postconviction petitioners. *Collins*, 202 Ill. 2d at 68. However, the court made clear that petitioners must still comply with section 122—2:

> "This does not mean, however, that the petitioners in such cases are relieved of bearing any burden whatsoever. On the contrary, section 122—2 makes clear that the petitioner who is unable to obtain the necessary 'affidavits, records, or other evidence' must at least explain why such evidence is unobtainable. In this case, defendant is asking to be excused not only from section 122—2's evidentiary requirements but also from section 122—2's pleading requirements. Nothing in the Act authorizes such a comprehensive departure." (Emphasis omitted.) *Collins*, 202 Ill. 2d at 68.

Given this language, we reject defendant's argument that *Collins* does not require an explanation of the absence of attached documentation and reject defendant's argument that "the explanation for the lack of corroborating evidence or affidavits can be inferred from the facts alleged" in the petition. Defendant failed to attach the necessary affidavits, records, or other evidence and failed to offer an explanation for the absence of such documentation. Accordingly, summary dismissal was proper. *Collins*, 202 Ill. 2d at 66.

Moreover, unlike *Collins* or *Williams*, which address allegations of ineffective assistance in the context of a guilty plea, the instant case alleges ineffective assistance for failing to sufficiently challenge the voluntariness of defendant's confession. A review of the record supports summary dismissal because the record refutes defendant's claims of ineffectiveness. Ineffective assistance of counsel is established when

it is proven that counsel's representation fell below an objective standard of reasonableness and that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 694, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2064, 2068 (1984). The defendant must overcome a "strong presumption" that the lawyer's conduct falls within the wide range of reasonable professional assistance and that the challenged conduct constitutes sound trial strategy. *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065. If the ineffectiveness claim can be disposed of on the basis that the defendant did not suffer sufficient prejudice, a court need not consider whether counsel's performance was deficient. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104. S. Ct. at 2069; *People v. Erickson*, 161 Ill. 2d 82, 90 (1994). For the reasons previously discussed, the record rebuts defendant's claims of ineffectiveness. Trial counsel properly challenged the voluntariness of defendant's confession. We conclude that defendant's petition failed to raise the gist of a meritorious claim that trial counsel was ineffective for failing to present sufficient evidence of the involuntariness of her confession.

## II. Extended-Term Sentence and *Apprendi*

■ Defendant contends that her extended-term sentence should be vacated because, in violation of *Apprendi*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348, the facts supporting an enhanced sentence were never charged. Defendant argues that because J.P.'s age and the allegation that the crime was exceptionally brutal and heinous were not charged, she did not have notice that she qualified for an extended-term sentence. We are mindful that our supreme court recently held in *People v. Swift*, 202 Ill. 2d 378, 392 (2002), that for purposes of *Apprendi* analysis, the sentencing range for first degree murder is 20 to 60 years' imprisonment, and that any sentence greater than 60 years requires additional factual findings which must be proven beyond a reasonable doubt.

In this appeal, defendant urges us to apply *Apprendi* retroactively on postconviction review. There is a split of authority among the divisions of the First District regarding the retroactive application of *Apprendi* to cases pending on postconviction review. See, *e.g.*, *People v. Gholston*, 332 Ill. App. 3d 179 (2002); *People v. Scullark*, 325 Ill. App. 3d 876 (2001); *People v. Montgomery*, 327 Ill. App. 3d 180, 190-91 (2001); *People v. Kizer*, 318 Ill. App. 3d 238, 252 (2000) (holding that *Apprendi* does not apply retroactively); *People v. Kidd*, 327 Ill. App. 3d 973 (2002); *People v. Beachem*, 317 Ill. App. 3d 693, 706 (2000); *People v. Lee*, 326 Ill. App. 3d 882 (2001), *appeal allowed*, 198 Ill. 2d 625

(2002) (holding that *Apprendi* does apply retroactively). We agree with *Kizer* and its progeny and hold that *Apprendi* does not apply retroactively to cases on collateral review.

Moreover, on the merits defendant's *Apprendi* challenge fails. In *Swift*, unlike the instant case, the State did not seek the death penalty, but requested an extended-term sentence. In the instant case, the State sought the death penalty and defendant waived a jury for both phases of the capital sentencing hearing. The trial judge found defendant eligible for the death penalty based on the aggravating factor designated in section 9—1(b)(7) of the Criminal Code of 1961. 720 ILCS 5/9—1(b)(7) (West 1998). Under section 9—1(b)(7), the trial judge found defendant eligible for the death penalty because J.P. was under 12 years old and his death resulted from exceptionally brutal and heinous behavior indicative of wanton cruelty. 720 ILCS 5/9—1(b)(7) (West 1998). The section 9—1(b)(7) aggravating factor was required to be proved by the State beyond a reasonable doubt. 720 ILCS 5/9—1(f) (West 1998). Defendant waived his right to have a jury determine whether the section 9—1(b)(7) factor had been proved beyond a reasonable doubt, and following the jury waiver, the trial judge found that the State proved the aggravating factor necessary for the imposition of any penalty up to and including death.

The trial judge declined to impose the death penalty based on defendant's lack of significant criminal background, the fact that defendant was abused by her mother as a child, and the fact that defendant "was operating under a high degree of stress at the time of this beating." Rather than imposing a death sentence, the judge imposed an extended term of 80 years' imprisonment based on the same aggravating factor on which the finding of death eligibility was predicated and proved by the State beyond a reasonable doubt. Therefore, no *Apprendi* violation occurred. See *People v. Tye*, 323 Ill. App. 3d 872 (2001).

Regarding notice, the indictment charged defendant with first degree murder for beating and strangling the five-year-old victim. The record reflects that defendant was aware of the State's intent to seek the death penalty, as demonstrated by the following discussion between the trial court and defense counsel:

"THE COURT: You are aware though that prior to and I believe there was discussion of this earlier that the State was going to seek the death penalty in this particular case?

DEFENSE COUNSEL: Yes, judge. We are not arguing notice.

\* \* \*

THE COURT: He's not arguing notice. He's basically arguing there is not sufficient statutory aggravating factors to even have a hearing.

DEFENSE COUNSEL: Correct."

In this case, where the State sought the death penalty and defendant waived a jury for both phases of the capital sentencing hearing, defendant cannot contend that she was denied the right to a jury because she waived a jury. Defendant cannot argue that the standard of proof was lacking because section 9—1(f) of the Criminal Code of 1961 (720 ILCS 5/9—1(f) (West 1998)) requires the death-eligibility factors to be proven beyond a reasonable doubt regardless of whether the proceedings take place before a jury or before the trial judge without a jury. Defendant was found eligible for the death penalty. Moreover, based on this record, for the reasons previously discussed, defendant cannot claim lack of notice or that she was unaware of the possible sentencing consequences.

We are mindful that the Supreme Court in *Apprendi* noted that enhanced sentencing without proof beyond a reasonable doubt dealt with "constitutional protections of surpassing importance." *Apprendi*, 530 U.S. at 476, 147 L. Ed. 2d at 447, 120 S. Ct. at 2355. The Court in *Apprendi* further recognized that the traditional role of the jury to determine the facts that provide the basis for the maximum sentence under law is "an indispensable part of our criminal justice system." *Apprendi*, 530 U.S. at 497, 147 L. Ed. 2d at 459, 120 S. Ct. at 2366. In the context of this case, the enhanced sentence was imposed after the State proved the aggravating factor beyond a reasonable doubt. Defendant had, but waived, the opportunity to have a jury make the determination as to whether the aggravating factor had been proved beyond a reasonable doubt. Under these circumstances, the imposition of defendant's extended-term sentence did not violate *Apprendi*.

### III. Ineffective Assistance of Appellate Counsel

Defendant contends that appellate counsel was ineffective in not arguing on direct appeal that her sentence was excessive in light of the circumstances of the offense and defendant's limited criminal history. The circumstances of the offense that defendant asserts support a claim of excessiveness include (1) that J.P.'s death resulted from physical discipline, as opposed to a calculated and premeditated act; (2) that once she realized the severity of J.P.'s injuries, she called 911 and performed CPR; (3) that she was under significant stress, the children were misbehaving, and she was suffering from the recent death of her mother; and (4) that she had drunk four shots of whiskey within 90 minutes of the fatal beating, and the alcohol, the effects of which may have been intensified by the medication she was taking, may have affected her judgment. Defendant also emphasizes that she only has two prior convictions: one in 1982 for aggravated assault and

one in 1976 for possession of cannabis. Defendant argues that all the facts necessary to address the excessiveness issue were in the record and that, given the obviousness of the issue, appellate counsel's failure to raise it on appeal was deficient as her sentence would likely have been reduced had its excessiveness been challenged on appeal.

■ Defendant acknowledges that she did not raise this argument in her *pro se* postconviction petition, but she urges us to review the issue as a matter of fundamental fairness. As noted above, any claim of substantial denial of constitutional rights that is not raised in the original or an amended petition is waived. 725 ILCS 5/122—3 (West 1998). However, where fundamental fairness so requires, the waiver rule may be relaxed. *People v. Davis*, 156 Ill. 2d 149, 158 (1993). The doctrine of "fundamental fairness" requires review of waived claims only when a defendant shows cognizable "cause" for her failure to make timely objection and shows "actual prejudice" resulting from the error of which she complains. *People v. Hudson*, 195 Ill. 2d 117, 123 (2001).

Defendant has offered no explanation as to why this claim of ineffectiveness was not raised in her *pro se* postconviction petition. Accordingly, she has failed the "cause" portion of the fundamental fairness test. Moreover, she has not shown that actual prejudice resulted from appellate counsel's failure to argue on direct appeal that her sentence was excessive. To establish "actual prejudice," a defendant must demonstrate not merely that the error complained of created a possibility of prejudice, but that the error was of constitutional dimensions and worked to her actual and substantial disadvantage. *Hudson*, 195 Ill. 2d at 123-24.

Defendant was convicted of first degree murder. Generally, first degree murder carries a sentence of 20 to 60 years in prison. 730 ILCS 5/5—8—1(a)(1)(a) (West 1998). However, the State sought the death penalty. Defendant waived a jury for both phases of the capital sentencing hearing. The judge considered the presentence investigation report and heard the testimony of several witnesses. The judge also considered stipulated testimony, a victim impact statement, and the arguments of the attorneys. The trial judge found defendant eligible for the death penalty because the victim, J.P., was under 12 years old, and J.P.'s death resulted from exceptionally brutal and heinous behavior indicative of wanton cruelty. Based upon this finding the trial judge could have imposed the death penalty (720 ILCS 5/9—1(b)(7) (West 1998)) or life imprisonment (730 ILCS 5/5—8—1(a)(1)(b) (West 1998)) or an extended-term sentence between 60 and 100 years (730 ILCS 5/5—8—2(a)(1), 5—5—3.2(b) (West 1998)). However, the judge declined to impose the death penalty because defendant had no

significant criminal background, was abused by her mother as a child, and "was operating under a high degree of stress at the time of this beating." The judge imposed an extended-term sentence of 80 years in prison.

A trial court's sentencing determination must be based on the particular circumstances of each case, including factors such as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *People v. Fern*, 189 Ill. 2d 48, 53 (1999); *People v. Perruquet*, 68 Ill. 2d 149, 154-55 (1977). Generally, the trial court is in a better position than a court of review to determine an appropriate sentence considering the particular facts and circumstances of each individual case. *Perruquet*, 68 Ill. 2d at 154. The trial court is the proper forum for the determination of a defendant's sentence, and the trial court's decisions in regard to sentencing are entitled to great deference and weight. *Perruquet*, 68 Ill. 2d at 154. Absent an abuse of discretion by the trial court, a sentence may not be altered upon review. *Perruquet*, 68 Ill. 2d at 154. If the sentence imposed is within the statutory range, it will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Fern*, 189 Ill. 2d at 54.

The record establishes that the trial court was fully aware both of the circumstances surrounding the crime and of defendant's limited criminal history. In deciding not to impose the death penalty, the trial court outlined the mitigating evidence:

"I believe there are several factors in this. Three of them that I will state is one, lack of any significant background. There is no doubt there is no significant criminal background. There is testimony from her as to having a childhood very similar to this. And although this does not excuse or to any degree mitigate except for purpose of death penalty would mitigate it. It's clear she was operating under a high degree of stress at the time of this beating."

After hearing further argument, the trial court indicated as follows:

"This is perhaps one of the worst beating cases, if not the worst beating case I have ever observed. I have taken into account all the other, all the factors. When I say this I am considering the facts of the case, those matters in aggravation and mitigation, the arguments and statements made by the parties, all the matters that are statutory in aggravation and mitigation, as well as those brought to my attention. It's the sentence order of this court that you serve [an] extended term sentence of 80 years in the Illinois Department of Corrections."

The record reflects that the trial court considered all factors in

mitigation and aggravation and sentenced defendant well within the statutory range. The experienced trial court indicated that J.P.'s death resulted from "one of the worst beating cases, if not the worst beating case" it had ever observed. The sentence was not greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. Based on the record, the trial court did not abuse its discretion in sentencing defendant, and the 80-year term was not excessive.

Defendant has not demonstrated that she was actually prejudiced by appellate counsel's failure to argue on appeal that her sentence was excessive. Accordingly, fundamental fairness does not compel us to relax the waiver rule and review defendant's claim. Waiver aside, for the reasons previously discussed, we reject defendant's argument that appellate counsel's failure to raise the excessive sentence issue demonstrated ineffective assistance of counsel. We conclude defendant's sentence would not have been reduced had it been challenged on appeal based on excessiveness.

### IV. Single Subject Challenge

We reject defendant's contention that Public Act 83—942, effective November 23, 1983, amending the Post-Conviction Hearing Act to allow first-stage dismissals, violates the single subject clause of the Illinois Constitution (Ill. Const. 1970, art. IV, § 8(d)). See *People v. Boclair*, 202 Ill. 2d 89, 108-13 (2002).

### CONCLUSION

Defendant's extended-term sentence of 80 years in prison does not violate *Apprendi* and is constitutional. The extended-term sentence of 80 years in prison is not excessive. Defendant's sentence is affirmed. Public Act 83—942 does not violate the single subject rule. The dismissal of defendant's postconviction petition is affirmed because the petition failed to present the gist of a constitutional claim.

Affirmed.

O'BRIEN, P.J., and GALLAGHER, J., concur.