# Illinois Official Reports

## Appellate Court

---

### *People v. Macias*, 2015 IL App (1st) 132039

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT MACIAS, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-13-2039 |
| Filed | June 26, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CR-16031; the Hon. Maura Slattery Boyle, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Richard Dvorak, of Law Offices of Richard Dvorak, of Chicago, for appellant.<br><br>Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Christine Cook, and Peter Maltese, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion.<br>Presiding Justice Palmer and Justice Reyes concurred in the judgment and opinion. |

**OPINION**

¶ 1    Following a jury trial, defendant Robert Macias was found guilty of the first degree murder of Victor Casillas, and the attempted murder and aggravated battery with a firearm of Lionel Medina. Defendant was subsequently sentenced to a total of 75 years in the Illinois Department of Corrections.

¶ 2    Defendant appeals, arguing that: (1) the trial court erred in denying his motion to suppress statements because defendant was given defective *Miranda* rights, and his statement was involuntary as a result of his will being overborn by police detectives; (2) his trial counsel was ineffective for failing to object to harmful inadmissible evidence and introducing such harmful evidence, failing to introduce favorable evidence to explain why defendant confessed, failing to raise missing portions of the videotaped interrogation in his motion to suppress, and failing to submit a jury instruction that the jurors could not consider defendant's decision not to testify at trial; (3) defendant was denied a fair trial when the trial court admitted prejudicial photographs from a MySpace page without proper foundation or authentication; and (4) the trial court committed reversible error by not permitting defendant to introduce evidence from the videotaped interrogation that explained why he confessed and by failing to ensure the jury was properly instructed on the law.

¶ 3    The shootings occurred around 8:30 p.m. on March 19, 2007, near West 30th Street and South Kildare Avenue in Chicago. Defendant was arrested on June 2, 2007, and interrogated for approximately 46 hours at Area 3 at West Belmont Avenue and North Western Avenue. After viewing a video recording of codefendant Oscar Flores's statement that incriminated him, defendant gave a statement admitting that he was driving the van when Flores shot the victims. Prior to trial, defendant filed a motion to suppress his statements. The written motion is not contained in the record on appeal, but the record does contain the transcripts of the hearing and ruling on the motion. Defendant argued at the hearing that his statements should be suppressed because (1) his *Miranda* rights were violated; (2) his request for an attorney was not honored; and (3) his statement was not voluntary because his will was overborne by the detectives.

¶ 4    At the suppression hearing, defendant presented the testimony of his mother, Hermilinda Montoya. Montoya testified that on the evening of June 2, 2007, she was informed by her daughter that defendant was missing. She went to the police station at West Ogden Avenue and South Kedzie Avenue, and asked if defendant was at the police station. An officer stated that he was not there. Montoya asked to file a missing person report, but was told by the officer that defendant's father had already filed a report. She asked to file another report, but was told she could not. On June 4, she went to the police station at West Harrison Street and South Kedzie Avenue, and was directed to the Belmont and Western station. At the station, she was told that defendant was in custody and under investigation, but was not permitted to see defendant. Defendant was 17 years old in June 2007.

¶ 5    The DVD recordings from the electronic recording interview device (ERI) in the interview room were admitted into evidence. Defendant rested.

¶ 6    Detective Gregory Swiderek testified for the State. He stated he was assigned to investigate Casillas's homicide. He arrested defendant on June 2, 2007, at approximately 9 p.m. Defendant was brought to Area 3 for questioning. Detective Swiderek testified that he gave defendant his *Miranda* rights when he placed defendant under arrest, and later at 9:38 p.m., he

readvised defendant of his *Miranda* rights in the interview room. Defendant indicated that he understood his rights. Defendant gave an inculpatory statement at approximately 7:30 p.m. on June 4, 2007, after viewing a portion of codefendant Flores's statement.

¶ 7        After reviewing the testimony and the DVD recordings, the trial court denied defendant's motion to suppress his statements.

¶ 8        The following evidence was presented at defendant's October 2011 jury trial. Defendant was tried simultaneously with Flores, but with separate juries. Detective Gregory Swiderek initially testified before defendant's jury only. He stated that he was assigned to investigate the homicide of Victor Casillas on March 19, 2007. At approximately 9 p.m. on June 2, 2007, Detective Swiderek placed defendant under arrest, gave defendant his *Miranda* rights, and transported him to Area 3, where he was placed in an interview room. The ERI was turned on at 9:33 p.m. At 9:37 p.m., Detective Swiderek and his partner, Detective Roberts, entered the room and told defendant he was there for the homicide of Casillas. He also told defendant that he would be placed in multiple lineups. Detective Swiderek then advised defendant of his *Miranda* rights.

¶ 9        While defendant was in custody, he appeared in multiple lineups in front of witnesses to the shootings. A polygraph examination was administered to defendant on June 3, 2007. Over the course of his time in custody, defendant was interviewed multiple times by the detectives regarding defendant's involvement in the case.

¶ 10        At approximately 6:30 p.m. on June 4, 2007, Detective Swiderek with Detective Roberts had a conversation with defendant. Detective Swiderek asked defendant if he would like to view a portion of codefendant Flores' statement. After technical difficulties, defendant was shown Flores's statement around 7:20 p.m. The interview of defendant resumed after he viewed the statement. A portion of the videotaped statement was played for the jury.

¶ 11        In the video, defendant said a person called Sonic picked him up in a van and they later picked up Flores. Sonic parked the van at West 26th Street and South Drake Avenue, and they left the vehicle. Later, defendant and Flores took the van. Defendant was able to drive without keys because the steering column was "peeled," which allowed it to be operated without keys. They picked up another man, but eventually dropped him off. Flores asked defendant to drive him home, which defendant did. When Flores returned to the van, he showed defendant that he had a gun inside a white sock. Defendant said Flores encouraged him to drive into the territory of their gang rivals, the Two-Sixes. Defendant did so. In the area near South Karlov Avenue and West 30th Street, he saw someone he described as a "little kid" walking on the sidewalk. Defendant stated that he stepped on the brakes and slowed the van down. Defendant "threw up the bunny," and the boy responded and "threw down the crown," which is a sign of disrespect to the Latin Kings, which was defendant and Flores's gang. Flores then said, "What's up b***?" and fired three shots. Defendant stepped on the gas and then heard a fourth gunshot.

¶ 12        Defendant initially denied knowledge of a second shooting but later admitted that, after the first shooting, as he drove down 30th Street, they encountered another individual. Defendant said that he ducked down in the driver's seat and could not tell if the gunshots were coming from inside the van or from outside at the van.

¶ 13        Detective Swiderek also testified about the gangs in the area of the shooting, including the Latin Kings and the Two-Sixes. He explained some of the terms used by defendant and demonstrated the different gang signs for the jury. Detective Swiderek stated that when he mentioned the second shooting, he was not trying to feed information to defendant, but to

clarify that more than one person had been shot. He did not think defendant was telling the complete truth at that time.

¶ 14      Detective Swiderek also identified two exhibits which were photographs from MySpace.com. The first photograph was given to him by another detective and showed Casillas with writing, "Little Bones Rotsk, ha, ha, ha, one less Avers." Defendant said he knew the person in the photograph as "Baby Risky," but not as "Little Bones." The second photograph was of defendant with his face blacked out. The photograph says, "Almighty Drake Latin King Latin Criminal," and defendant was "throwing off gang signs." Detective Swiderek testified that he showed defendant this photograph during the interview and defendant admitted it was him. Defendant admitted that he used to be a Latin King from 27th and Drake, and he was called "Criminal."

¶ 15      On cross-examination, Detective Swiderek testified that defendant initially denied his involvement in the March 19, 2007, shootings. He stated that defendant was fed and allowed to use the restroom anytime he needed by knocking on the door. Detective Swiderek admitted that at the time of his statement at 7:30 p.m. on June 4, 2007, defendant had been in custody for 46 hours. Detective Swiderek denied telling defendant that if he gave a statement, then he would be released, as Flores had been. On redirect, Detective Swiderek stated that defendant did not make any incriminating statements until he watched a portion of Flores's statement.

¶ 16      Lionel Medina testified at trial and admitted he was a member of the Two-Six gang. On March 19, 2007, he was near 28th Street and Kildare when he saw a two-tone blue and gray van at a stop sign. The passenger pulled out a gun and fired. Medina was shot, but survived. Medina was not able to make any identifications in two lineups.

¶ 17      Leonardo Gonzalez testified that on March 19, 2007, he was walking with Victor Casillas on 30th Street when they heard gunshots. Both Gonzalez and Casillas were members of the Two-Six gang. They continued walking until he heard a vehicle behind them. He saw a blue and white van. According to Gonzalez, Casillas made a gang sign disrespectful to the Latin Kings. The passenger in the van fired two shots. Casillas started to run and Gonzalez fell down. He then saw that Casillas had been shot. Casillas fell down near 30th Street and Karlov Avenue.

¶ 18      Gonzalez was unable to make an in-court identification. Gonzalez testified that he viewed a lineup in May 2007, but he could not be sure who he identified. He said he identified Casillas's killer, but he did not know if he identified codefendant Flores. Gonzalez admitted that he gave a statement to an assistant State's Attorney (ASA) in May 2007. Two photographs were attached to the statement. One showed Casillas with the phrase "Lil Bonez Rotsk" written on it, which was disrespectful to Casillas. The second photo was of a Latin King with the caption "Little Rowdy." Gonzalez did not remember if he identified "Little Rowdy" as the shooter.

¶ 19      The State later called the ASA who took the statement and she testified that Gonzalez identified Flores as the shooter. She stated that she wrote down what Gonzalez told her and they reviewed the statement before he signed it.

¶ 20      Gonzalez also could not recall his grand jury testimony. The State called the ASA who presented Gonzalez at the grand jury. She testified that Gonzalez identified Flores as the shooter.

¶ 21 On cross-examination, Gonzalez admitted that the occupants of the van were two male Hispanics. When asked if he could identify the driver, Gonzalez stated that all he "saw was a shadow." He said the police arrived in three to four minutes. He testified that he was taken to the police station in handcuffs.

¶ 22 Antonio Casillas testified that he was the older brother of Victor Casillas. Antonio stated that he had viewed a MySpace page and saw pictures of his brother and Flores. He said he recognized Flores as "Little Rowdy." He said he then looked through a Farragut High School yearbook and found "Little Rowdy" under Flores's name. Antonio testified that he approached a security guard he knew was an off-duty police officer at his brother's funeral. Antonio gave the officer Flores's name. A couple days later, two detectives came to his house and Antonio showed the detectives the MySpace page.

¶ 23 Antonio was shown three photographs from the MySpace page. The first was a picture of Flores making gang signs with the caption "Lil Rowdy." The second was a photo of Casillas with a caption "Lil Bonez Rotsk," which Antonio testified meant "bragging about how [his] brother is dead." The third photo was another picture of Casillas with the caption, "Lil Bonez Rotsk!! hahaha 1 less Avers … hahaha." Antonio stated this caption was laughing and bragging about his brother's death.

¶ 24 Antonio denied having a conversation with Gonzalez about the MySpace page and about who Gonzalez needed to identify as the shooter. He also denied telling Gonzalez to specifically identify Flores as the shooter. He stated that he called Gonzalez because the detectives wanted to speak with Gonzalez.

¶ 25 Lorena Aguilar and Elizabeth Hernandez each testified that at around 8 to 8:30 p.m. on March 19, 2007, they were walking east on 30th Street, between Tripp Avenue and Kildare Avenue, when they heard gunshots. Both testified that they turned around to look back and saw a two-tone Astro van. When the van passed them, Aguilar stated that she saw two Hispanic males in their twenties and Hernandez said she also saw two Hispanic males in their twenties or older. Aguilar described the driver as wearing a dark sweatshirt and the passenger was wearing a white T-shirt and had short hair. Hernandez corroborated Aguilar's description. After the van passed them and was no longer in their view, both testified that they heard more gunshots. Each testified that they ran toward the gunshots and saw a group near a person who had been shot. Both women separately viewed a photo array but testified that they could not identify the shooter. Aguilar denied that she made a tentative identification. Both women also separately viewed a lineup but did not make an identification.

¶ 26 Lizette Martinez testified that around 8 or 8:30 p.m. on March 19, 2007, she was walking her dog eastward on 30th Street with her neighbor, Rita Serrano, when she heard four gunshots coming from behind her. She looked and saw a blue and gray Astro van head east on 30th onto Kedvale. When the van passed her, Martinez saw two males. She said the passenger was wearing a white T-shirt. She heard two more gunshots. Martinez viewed a photo array and did not make an identification. She later viewed a lineup but did not make an identification.

¶ 27 Yolanda Gutierrez testified that she was the owner of a 1989 Chevy Astro van. She reported the van stolen on March 16, 2007. She was notified a few weeks later the van had been found. She identified the van in photographs presented at trial.

¶ 28 Detective Swiderek was recalled later in the State's case before both juries. He denied handcuffing Gonzalez on the date of the shooting. He stated that Gonzalez came to the police station willingly. Detective Swiderek testified that a gang intelligence officer told him that an

individual named Abraham Barajas, a Latin King member, was bragging that he was involved in the homicide. Detective Swiderek stated that he showed Aguilar, Hernandez, and Martinez a photo array that contained Flores, Barajas, and five fillers. All three said they did not see Barajas the night of the shooting, but they tentatively identified Flores. Each said she would need to see him in a lineup. Serrano was not able to identify anyone. Later in May 2007, Flores was placed in multiple lineups, but Aguilar, Hernandez, Martinez, and Medina were unable to make an identification. Gonzalez identified Flores in a lineup as the individual who shot and killed Casillas.

¶ 29    After defendant's arrest on June 2, 2007, Detective Swiderek testified that defendant was placed in multiple lineups. Aguilar, Martinez, and Gonzalez were unable to make an identification. Hernandez refused to come to the police station to view a lineup.

¶ 30    On cross-examination, Detective Swiderek explained that Antonio was able to view the MySpace photographs through his cousin. She sent a friend request to "Little Rowdy," and after it was accepted, they were able to obtain the pictures. He stated that he viewed 75 MySpace photographs. When asked if defendant was in any of the photographs, Detective Swiderek responded, "There were many." Detective Swiderek admitted that the first time he learned of defendant was in Flores's statement. He agreed that defendant was not identified in any lineup, and no information he received involved defendant. On redirect, Detective Swiderek identified four photographs from the MySpace account of defendant.

¶ 31    The parties stipulated that six cartridge cases were recovered at the scenes of the shootings, but no fingerprints were recovered from the casings. The parties also stipulated that Casillas's cause of death was a single gunshot wound that caused massive bleeding from his chest cavity and the manner of death was homicide.

¶ 32    The State rested. Defendant moved for a directed verdict, which the trial court denied.

¶ 33    Gabriel Navarro testified for the defense. He stated that in March 2007, defendant and defendant's father were living with him. On March 19, 2007, Navarro testified that he was with defendant most of day. He was home with defendant from 6:30 p.m. to 10:30 p.m., when Navarro went to bed. They had played cards that evening until defendant went to play video games.

¶ 34    On cross-examination, Navarro stated that he was asked to be an alibi witness in March 2011, but he said that he told defendant a couple years ago that he wanted to testify. Navarro admitted that he did not speak with police.

¶ 35    Following deliberations, the jury found defendant guilty of the first degree murder of Casillas and the attempted murder and aggravated battery with a firearm of Medina. The trial court subsequently sentenced defendant to a term of 39 years for the first degree murder conviction with an additional 15-year firearm enhancement, 6 years for the attempted murder conviction, and 15 years for the aggravated battery conviction, to be served consecutively. Defendant received a total sentence of 75 years.

¶ 36    This appeal followed.

¶ 37    On appeal, defendant first argues that the trial court erred in denying his motion to suppress his statement to police. Specifically, defendant contends that he received defective *Miranda* warnings, and the statements were involuntary and his will was overborne. As previously noted, defendant's written motion to suppress is not included in the record on appeal. It is defendant's burden as the appellant to present a complete record on appeal and any doubts

arising from an incomplete record will be construed against defendant. *People v. Smith*, 406 Ill. App. 3d 879, 886 (2010). Our review of this issue is, therefore, limited to the arguments and evidence presented at the hearing on the motion.

¶ 38　　In reviewing a trial court's ruling on a motion to suppress, this court applies a *de novo* standard of review. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001); see also *Ornelas v. United States*, 517 U.S. 690, 699 (1996). However, findings of historical fact are reviewed only for clear error and the reviewing court must give due weight to inferences drawn from those facts by the fact finder. *Id.* Accordingly, we will accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence; however, we will review *de novo* the ultimate question of the defendant's legal challenge to the denial of his motion to suppress. *Sorenson*, 196 Ill. 2d at 431. However, in this case, the trial court did not hear any live testimony but instead viewed the recordings of defendant's interrogations. Because there was no live testimony presented and we are reviewing the same evidence the trial court reviewed, we conclude our review of the trial court's ruling on the motion to suppress is *de novo*.

¶ 39　　"Where a defendant challenges the admissibility of his confession through a motion to suppress, the State has the burden of proving the confession was voluntary by a preponderance of the evidence." *People v. Braggs*, 209 Ill. 2d 492, 505 (2003) (citing 725 ILCS 5/114-11(d) (West 2000)).

¶ 40　　On June 2, 2007, the police arrested defendant and placed him in a locked interrogation room at Area 4 around 9:35 p.m. Defendant was 17 years old at the time of his arrest. Defendant was held in the interrogation room until approximately 9:30 p.m. on June 4, 2007. Defendant gave an inculpatory statement beginning at approximately 7:30 p.m. on June 4, after viewing a portion of codefendant Flores's statement. The ERI recorded the period of defendant's detention in the interrogation room.

¶ 41　　Defendant first contends that his motion to suppress should have been granted because he received incomplete and defective *Miranda* warnings. The State maintains that defendant received proper warnings.

¶ 42　　When defendant was placed in the interrogation room, Detective Swiderek informed defendant that he was arrested and detained for questioning in the shooting death of Casillas. Detective Swiderek then gave defendant his *Miranda* rights as follows.

> "DETECTIVE: All right, these are your rights. You have the right to remain silent. Do you understand that? I need a yes or a no.
>
> DEFENDANT: Yes sir. I'm ready right here.
>
> DETECTIVE: You have the right to have an attorney. You understand that?
>
> DEFENDANT: Yes sir.
>
> DETECTIVE: Okay. Anything you say can and will be used against you in the court of law. You understand that?
>
> DEFENDANT: Yes sir.
>
> DETECTIVE: Okay. If you can't afford an attorney, they give you one for free. You understand that?
>
> DEFENDANT: Hmm-mmm.
>
> DETECTIVE: Is that a yes?

DEFENDANT: [Indicating.]"

¶ 43 Defendant asserts that his *Miranda* rights were defective because he was not informed of his right to have an attorney present prior to or during questioning.

"In *Miranda v. Arizona*, 384 U.S. 436, 444 *** (1966), the Supreme Court held that before conducting a custodial interrogation, law enforcement officers must administer warnings to the defendant sufficient to inform him of his privilege against self-incrimination. The four essential elements of the warning that is required to be given to a defendant in custody before questioning are: (1) the defendant must be told of his right to remain silent; (2) that anything he says may be used against him; (3) that he has the right to have counsel present before and during questioning; and (4) that he is entitled to have counsel appointed if he cannot afford one." *People v. Martinez*, 372 Ill. App. 3d 750, 754 (2007) (citing *Miranda v. Arizona*, 384 U.S. 436, 479 (1966)).

¶ 44 However, the Supreme Court has "never insisted that *Miranda* warnings be given in the exact form described in that decision." *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989). Rather, the Court has "stated that 'the "rigidity" of *Miranda* [does not] exten[d] to the precise formulation of the warnings given a criminal defendant,' and that 'no talismanic incantation [is] required to satisfy its strictures.' " *Id.* at 202-03 (quoting *California v. Prysock*, 453 U.S. 355, 359 (1981)). "Reviewing courts therefore need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by *Miranda*.' " *Id.* at 203 (quoting *Prysock*, 453 U.S. at 361).

¶ 45 Illinois courts have already considered the claim that defendant's *Miranda* rights were defective when the defendant was not specifically advised that he had the right to have an attorney present before and during questioning. In *People v. Walton*, 199 Ill. App. 3d 341, 343 (1990), the defendant contended on appeal that "the State failed to prove that [the police officer] advised defendant of his right to have an attorney present before and during interrogation and that this rendered defendant's confession inadmissible." (Emphasis omitted.)

¶ 46 At the suppression hearing, the police officer testified that he gave the defendant his *Miranda* rights " 'conversationally.' " *Id.* at 342. The prosecutor then asked the officer if he gave each of the individual rights, and the officer answered that he had. The exception was that when asked if he advised the defendant he could have a lawyer present during questioning, the officer responded, " 'I don't know if I said that.' " *Id.* at 343. The trial court denied the defendant's motion to suppress. At trial, the defendant testified that he did not receive any of his *Miranda* rights.

¶ 47 The Fourth District found:

"[T]he *Miranda* warnings given to defendant in this case, in their totality, were sufficient in that they 'reasonably conveyed' to defendant his rights as required by *Miranda*. In so holding, we note that defendant was specifically informed that he 'had a right to consult with a lawyer.' While the better practice would be for the police to make explicit that defendant's right to consult with a lawyer may be both before and during any police interrogation, we hold that the language used in this case was sufficient to imply the right to counsel's presence during questioning." (Emphasis omitted.) *Id.* at 344.

¶ 48    The reviewing court further reasoned that "to hold otherwise would be to import a rigidity to the *Miranda* warnings and to require a 'talismanic incantation,' both of which actions have been explicitly disapproved by the Court." *Id.* at 345.

¶ 49    More recently, in *Martinez*, the defendant again asserted that his *Miranda* rights were fatally defective because he was not advised of his right to have an attorney present before and during questioning. *Martinez*, 372 Ill. App. 3d at 754. The Fourth Division of this court observed that the Supreme Court has never insisted that *Miranda* rights must be given exactly but, rather, "*Miranda* warnings must reasonably convey to a suspect his rights." *Id*. (citing *Duckworth*, 492 U.S. at 203). The *Martinez* court also relied on the holding in *Walton* and found that the "defendant has failed to show that the trial court erred in denying his motion to suppress under *Miranda*." *Id.* at 755.

¶ 50    Defendant admits that the holdings in *Walton* and *Martinez* are contrary to his argument, but asks this court not to follow these decisions because they are counter to the Supreme Court decisions in *Miranda*, *Prystock*, and *Duckworth*. We disagree with defendant and find the decisions in *Walton* and *Martinez* adhere to the Court's position that *Miranda* rights do not have to be precisely recited, but must "reasonably convey" a defendant's rights. Such was done in this case. Defendant was advised that he had the right to remain silent, that anything he said could be used against him in court, that he had the right to an attorney, and that if he could not afford an attorney, one would be appointed for him. As the courts in *Walton* and *Martinez* found, the failure to include that the defendant could have an attorney present before and during questioning does not render *Miranda* rights fatally defective.

¶ 51    Further, we point out that defendant was later advised of his *Miranda* rights by the police officer that administered his lie detector test at approximately 3:50 p.m. on June 3, 2007, and prior to defendant making any inculpatory statements. These rights were also video recorded and the recording shows that defendant was advised that he had the right to have an attorney present before and during questioning and that he could stop questioning to consult an attorney. Defendant fails to acknowledge in his brief the administration of his *Miranda* rights in this instance. Even if Detective Swiderek's failure to advise defendant of his right to have an attorney present before and during questioning were error, which we do not find, any error was cured when defendant subsequently received his complete *Miranda* rights, which defendant then waived. Accordingly, we hold that the trial court properly denied defendant's motion to suppress under *Miranda*.

¶ 52    Next, defendant contends that based on the totality of the circumstances, the State failed to prove defendant's confession was voluntary. The State responds that the trial court properly found that defendant's confession was voluntary and his will was not overborne.

¶ 53    "In determining whether a defendant's statements are voluntarily made, a court must look to the totality of the circumstances surrounding the making of the statements." *People v. Armstrong*, 395 Ill. App. 3d 606, 624 (2009) (citing *People v. Brown*, 169 Ill. 2d 132, 144 (1996)). The factors for a court to consider when determining the voluntariness of an inculpatory statement include the defendant's age, education, background, experience, mental capacity, and intelligence, as well as the defendant's physical and emotional condition at the time of questioning, the duration of the questioning, and whether the defendant was subjected to physical or mental abuse by the police. *Id*. We review the trial court's finding that defendant's statement was voluntary *de novo*. *Id.* The State's burden on a motion to suppress is to show by a preponderance of the evidence that the confession was voluntary. *Id.* "No single

factor is dispositive, rather '[t]he test of voluntariness is whether the individual made his confession freely and voluntarily, without compulsion or inducement of any kind, or whether the individual's will was overborne at the time of the confession.' " *People v. Murdock*, 2012 IL 112362, ¶ 30 (quoting *People v. Morgan*, 197 Ill. 2d 404, 437 (2001)).

¶ 54    Defendant contends that a review of these factors shows that the State failed to establish by a preponderance of the evidence that defendant's confession was voluntary. Defendant first asserts that his age and parental factor weighs in favor of suppression. Defendant was 17 years old at the time of the interrogation. We note that while he was a minor, defendant was not a delinquent minor under the Juvenile Court Act of 1987 because he had turned 17 prior to the commission of the murder and the definition of a "delinquent minor" at the time of the crime was "any minor who prior to his or her 17th birthday" has violated any State law. 705 ILCS 405/5-105(3) (West 2006).[1]

¶ 55    The supreme court has observed that the "taking of a juvenile's confession is a sensitive concern, and for this reason the greatest care must be taken to assure that the confession was not coerced or suggested." *Murdock*, 2012 IL 112362, ¶ 32. "Illinois courts have recognized an additional factor not applicable in cases involving adults: the presence of a 'concerned adult.' " *Id.* (quoting *In re G.O.*, 191 Ill. 2d 37, 54-55 (2000)). "This factor considers whether the juvenile, either before or during the interrogation, had an opportunity to consult with an adult interested in his welfare." *Id.* "In weighing this factor, courts also consider whether the police prevented the juvenile from conferring with a concerned adult and whether the police frustrated the concerned adult's attempt to confer with the juvenile." *Id.* "However, a juvenile's confession or statement should not be suppressed merely because he was denied the opportunity to confer with a parent or other concerned adult before or during the interrogation." *Id.* ¶ 33. The concerned adult factor is just one of the factors to be considered under a motion to suppress. *Id.*

¶ 56    Here, defendant places a lot of weight on these factors. Specifically, he focuses on defendant's request to call his family to let them know where he was. Detective Swiderek testified that defendant made the request for a phone call for that purpose and he told defendant that he could make a phone call when he reached the lockup. However, there is no suggestion that defendant made any other requests to speak with a parent or to have one present for his interrogation.

¶ 57    Additionally, defendant's mother testified at the suppression hearing that she went to the police station at Ogden and Kedzie to look for defendant on June 2 and was told he was not there. She asked to file a missing person report but was told defendant's father had already filed one. On June 4, defendant's mother was directed to the police station at Belmont and Western and was informed that defendant was in custody, but she was not permitted to speak with defendant. Although we acknowledge defendant's mother's testimony about trying to locate defendant, we disagree with defendant's characterization of the police's behavior as "actively prevent[ing]" defendant from seeing his family. The interactions on June 2 do not suggest any intentional conduct by police to mislead defendant's mother or to keep her from defendant. While defendant's mother was not permitted to speak with defendant on June 4, we must consider the remaining factors to determine the voluntariness of defendant's confession.

---

[1]We note that the definition of "delinquent minor" is now applicable to "any minor who prior to his or her 18th birthday" has violated any state law. 705 ILCS 405/5-105(3) (West 2014).

¶ 58       Defendant also asserts that his lack of education and lack of prior experience with police interrogation weighs in favor of suppression. Defendant's mother testified that she removed him from school at 16 because defendant was doing poorly. She intended to enroll defendant in school in Indiana, where she lived. There was no testimony that defendant had a learning disability or was unable to understand the questioning by the detectives. "[S]tatements made by defendants with a ninth-grade education, or less, have been found voluntary in Illinois." *People v. Payne*, 336 Ill. App. 3d 154, 165 (2002) (citing *People v. Golden*, 323 Ill. App. 3d 892 (2001) (defendant was in ninth grade), *People v. Kolakowski*, 319 Ill. App. 3d 200 (2001) (defendant was 13 years old and reading at eighth-grade level), and *People v. Saunders*, 307 Ill. App. 3d 406, 409 (1999) ("the last time [the defendant] had regularly attended school was in eighth grade")).

¶ 59       Defendant's arrest report showed prior arrests for misdemeanors, including reckless conduct and possession of cannabis. Defendant had never been arrested in connection with a violent felony, as was the circumstance in this case. Defendant contends that this prior experience did not equip him "to survive a 46-hour marathon interrogation by seasoned law enforcement officers investigating a murder." However, we disagree with defendant's characterization of his time in interrogation. He was alone in the room for significant lengths of time and permitted to sleep for hours uninterrupted. Nothing in the record shows that defendant was incapable of understanding the severity of the circumstances. Defendant maintained that he was not involved during multiple interviews, and he made a statement only after viewing Flores's statement implicating defendant.

¶ 60       Defendant also asserts that his emotional and physical condition at the time of the interrogation weighs in favor of suppression. Defendant argues that the detectives "purposely manipulated his ability and desire to sleep." He points to a time when defendant was sleeping across three chairs, Detective Swiderek entered the room and removed all but one chair. As the trial court noted in its findings, "even when the three chairs were in the room, Mr. Macias, due to the constant lighting conditions, was under the desk." The court observed that defendant continued to sleep once the chairs were removed and defendant "had an adequate amount of sleep. *** Adequate in the sense that he slept for several hours uninterrupted." We agree with the trial court's observations of defendant's ability to sleep while in custody. The officers did not deprive defendant of sleep and this factor weighs against suppression.

¶ 61       Defendant also asserts that he was not fed sufficiently while in custody. Defendant states that he received two meals in custody, one consisting of a Polish sausage and French fries, and the second meal was not described. However, nothing in the record suggests that defendant requested additional food and was denied.

¶ 62       Defendant contends that the detectives engaged in "strong-arm bullying tactics," "intimidating," and "despicable" methods of interrogation. We have reviewed the interrogations and agree that the language used by the detectives was at times profane and vulgar as well as loud. The vulgar comments in particular implied what defendant would experience in prison. The trial court described the interrogation tactics as "aggressive," but noted that "the Court has consistently held that interrogation by its nature is confrontational." Defendant argues that this "horrible conduct" resulted in defendant's breaking down into tears.

¶ 63       While the interrogation was, as the trial court observed, aggressive, defendant does not point to any specific threats or how the use of fear rendered his confession involuntary. Defendant instead focuses on the language and "yelling" by the detectives. Our review of the

interrogation shows that defendant maintained his innocence during these aggressive points of interrogation. Further, defendant has not cited any authority finding that the use of profanity and yelling during an interrogation amounted to a threat sufficient to weigh in favor of suppressing a confession. We recognize that defendant appears emotional at times in the recordings, including times when he appears to cry, but those moments often occurred while defendant was alone in the interrogation room and do not appear to be directly connected to police conduct.

¶ 64    Defendant further contends that he was subject to deceit, trickery, and promises of leniency. Defendant references the detectives' description of the evidence against him, including physical evidence, and eyewitnesses, which was used to suggest the evidence was stronger than what was presented at trial. Defendant also claims that the detectives suggested that he would be released from custody, as Flores had been, if he implicated Flores in the shootings.

¶ 65    " 'To constitute a promise of leniency, the statement must be coupled with a suggestion of a specific benefit that will follow if defendant confesses.' " *People v. Lee*, 2012 IL App (1st) 101851, ¶ 34 (quoting *People v. Johnson*, 285 Ill. App. 3d 802, 808 (1996)). "However, a confession is not *per se* inadmissible even where promises or suggestions of leniency have been made." *Id.* (citing *Johnson*, 285 Ill. App. 3d at 807-08).

¶ 66    Defendant asserts that the detectives misstated evidence in an attempt to coerce him to confess. According to defendant, the detectives improperly claimed to have physical evidence, that eyewitnesses had identified him and would testify against him, Flores's statement matched the witnesses' descriptions of what had occurred, and the officer who administered the lie detector would testify against him. However, the recordings do not support defendant's contentions. The recordings show that the detectives often described the type of evidence they could have, including physical evidence. The physical evidence of the crime included bullets and shell casings as well as photographs of the stolen van. Though this evidence did not directly implicate defendant, it does not render the comments false and deceptive. Also, the detectives frequently referred to the eyewitnesses, but never explicitly told defendant that a witness identified him. Rather, the detectives said the witnesses included disinterested people who described what happened and that defendant would appear, and later had appeared, in lineups. Further, defendant fails to describe how Flores's statement was not in line with the witnesses' description that a van with two Hispanic male occupants was involved and the shooter was the passenger. While the lie detector examiner would not be able to testify, the sum of the detectives' statements was accurate descriptions of the evidence. Defendant has not shown how the detectives engaged in deceit to entice defendant to confess. As previously noted, defendant gave his inculpatory statement after viewing Flores's statement, in which Flores stated that defendant was the shooter and Flores was the driver. The viewing of Flores's statement was the impetus to cause defendant to confess.

¶ 67    Defendant also argues that the detectives implicitly made false promises to get him to confess. Specifically, defendant contends that the detective more than suggested he would be released if he said Flores was the shooter. Defendant points to the comments after viewing Flores's statement and returning to the interrogation room. At that time, Detective Swiderek stated that Flores was "out of here," and if defendant wanted Flores to remain out, "keep saying you don't know nothing." The implication of these statements was not that defendant would be

released but, rather, that if defendant said Flores was the shooter, then Flores would be taken back into custody.

¶ 68    Defendant also points to comments by Detective Swiderek suggesting that defendant could get a lower sentence or be charged with something other than first degree murder. The detective suggested that second degree murder or other charges could be possible, with the possibility of good-time credit. He stated that the shooter would receive a longer sentence. We acknowledge that a person accountable for first degree murder would not be eligible for second degree murder or manslaughter charges. While Detective Swiderek's suggestion of the possibility of second degree murder or manslaughter charges was a misstatement, he was correct that the shooter would receive a longer sentence. At a minimum, pursuant to section 5-8-1(a)(1)(d) of the Unified Code of Corrections, a person who discharged a firearm which caused death would receive a 25-year enhancement in comparison to a 15-year enhancement for a person who committed a crime while armed with a firearm. See 730 ILCS 5/5-8-1(a)(1)(d) (West 2006).

¶ 69    Although defendant concedes that the length of his time in custody was within the 48-hour limit set forth in *Gerstein v. Pugh*, 420 U.S. 103 (1975), he maintains that the 46-hour length weighs in favor of suppression.

¶ 70    After reviewing all of defendant's arguments on the factors to be considered in determining whether an inculpatory statement should be suppressed, we find that the weight of the factors falls against suppression. While the interrogation was aggressive at times, which included the use of profanity and vulgar comments, we do not believe defendant's will was overcome at the time of his confession. In so finding, we do not condone such tactics, nor do we approve of misstatements as to the charges defendant could face, but we do not believe that defendant was induced to confess as a result of these tactics. Rather, as previously discussed, defendant decided to make his statement after viewing Flores's statement. Defendant was not mistreated, deprived of food or sleep, promised leniency, or threatened. The length of time in custody was long, but as defendant admits, it was within the limits set by the Supreme Court. Moreover, defendant was not continuously being questioned. In sum, we conclude that the trial court properly denied defendant's motion to suppress his confession.

¶ 71    Defendant finally argues that his statement should have been suppressed under section 103-2.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/103-2.1 (West 2006)) because two portions of his custodial interview were not recorded. The unrecorded portions occurred when defendant left the interrogation room to view Flores's statement. The first attempt to view the statement was unsuccessful because the video did not load, and defendant was returned to the interrogation room. A short time later, defendant left the room and viewed the statement.

¶ 72    Section 103-2.1 "requires that statements made during a custodial interview be presumed inadmissible as evidence against the accused in any criminal proceeding brought under section 9-1 of the Criminal Code of 1961 or the Criminal Code of 2012 unless the entire interrogation was electronically recorded and the recording is substantially accurate and not intentionally altered." *People v. Green*, 2014 IL App (3d) 120522, ¶ 50 (citing 725 ILCS 5/103-2.1(b) (West 2008)); see also 725 ILCS 5/103-2.1(b) (West 2012). The statute does not preclude the admission "of a statement made during a custodial interrogation that was not recorded as required by this Section, because electronic recording was not feasible." 725 ILCS 5/103-2.1(e)(ii) (West 2006).

¶ 73    Defendant concedes that he failed to raise this argument in the trial court, but asks this court to review his claim because his lawyer provided him with ineffective assistance of counsel. He contends there was a reasonable probability that the motion to suppress would have been granted if this claim had been raised. Defendant offers no further argument on ineffective assistance of trial counsel in this regard.

¶ 74    Claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Id.* at 687. Defendant cannot establish either prong.

¶ 75    The crux of defendant's argument is that "in the age of portable laptop computers," it was feasible for defendant to view Flores's statement while in the interrogation room. Defendant offers no citation to the record or support for his speculation that such computers were in use and one was used for defendant to view Flores's statement. Defendant further asserts that a desktop computer could have been transferred to the interrogation room for defendant's viewing.

¶ 76    Significantly, defendant does not assert that he made any statement or that any questioning occurred during this unrecorded portion of his custody. Detective Swiderek's testimony at the suppression hearing discloses that defendant was taken from the interrogation room twice to view Flores's statement. The first time, there were problems and the video would not load. The second time, defendant watched the video at a computer terminal near the interrogation room.

¶ 77    Section 103-2.1(a) defines "custodial interrogation" as "any interrogation during which (i) a reasonable person in the subject's position would consider himself or herself to be in custody and (ii) during which a question is asked that is reasonably likely to elicit an incriminating response." 725 ILCS 5/103-2.1(a) (West 2006). "The cardinal rule of statutory construction is to ascertain and give effect to the legislature's intent." *People v. Comage*, 241 Ill. 2d 139, 144 (2011). "The legislature's intent is best indicated by giving the statutory language its plain and ordinary meaning." *Id.*

¶ 78    Section 103-2.1 limits custodial interrogation to the portions in which questions are asked that could cause a defendant to make an incriminating statement. Defendant has not asserted that such questioning occurred during the unrecorded periods of time. Nor does the record suggest that any such questions were posed. Under the plain language of the statute, defendant was not subject to "custodial interrogation" within the meaning of section 103-2.1 at that time. Accordingly, section 103-2.1 does not apply to these unrecorded portions of time of defendant's custody, and thus, defendant cannot show that trial counsel was ineffective for failing to raise this argument in a motion to suppress.

¶ 79    Next, defendant raises several claims of ineffective assistance of trial counsel. Specifically, defendant argues that his trial counsel was ineffective for: (1) failing to challenge harmful inadmissible evidence, such as, hearsay testimony from Detective Swiderek, defendant's nickname was "Criminal," and the admission of a MySpace photograph with a masked individual with "Criminal" written on the photograph; (2) introducing harmful evidence that Flores implicated defendant in the shooting; (3) failing to introduce favorable evidence to explain why defendant confessed and why the only eyewitness implicated Flores; (4) failing to file a motion to suppress his statements based on the missing portion of the videotaped interrogation; and (5) failing to submit a jury instruction that jurors should not consider defendant's decision not to testify. The State responds that defendant was not denied his

constitutional right to effective assistance of trial counsel where counsel presented a reasonable theory of defense.

¶ 80   As previously stated, claims of ineffective assistance of counsel are resolved under the standard set forth in *Strickland*, 466 U.S. 668. In *Strickland*, the Supreme Court delineated a two-part test to use when evaluating whether a defendant was denied the effective assistance of counsel in violation of the sixth amendment. Under *Strickland*, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Id.* at 687. To demonstrate performance deficiency, a defendant must establish that counsel's performance fell below an objective standard of reasonableness. *People v. Edwards*, 195 Ill. 2d 142, 162-63 (2001). In evaluating sufficient prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a case may be disposed of on the ground of lack of sufficient prejudice, that course should be taken, and the court need not ever consider the quality of the attorney's performance. *Id*. at 697.

¶ 81   Defendant's first ineffectiveness claim is that his trial counsel failed to object to inadmissible evidence and introduced harmful evidence. Both contentions involve testimony about codefendant Flores. Defendant contends that his trial counsel failed to object to triple hearsay testimony from Detective Swiderek that another officer told him a cooperating individual informed the officer that a person known as "Little Rowdy" was bragging that he was involved in the homicide. Defendant adds that a similar question was asked without objection and that defense counsel elicited details in his cross-examination of Swiderek. Additionally, defendant argues that his trial counsel was ineffective for introducing evidence that Flores implicated defendant.

¶ 82   However, all of these instances involved matters of trial strategy. As the supreme court has observed, "decisions regarding 'what matters to object to and when to object' are matters of trial strategy." *People v. Perry*, 224 Ill. 2d 312, 344 (2007) (quoting *People v. Pecoraro*, 175 Ill. 2d 294, 327 (1997)). "It is highly possible that defense counsel allowed the statement to pass without objecting to diffuse its importance, rather than object and draw further attention to the statement." *People v. Evans*, 209 Ill. 2d 194, 221 (2004). In order to prove ineffective assistance of counsel, defendant must overcome the presumption that this challenged conduct might be considered sound trial strategy under the circumstances. *People v. Giles*, 209 Ill. App. 3d 265, 269 (1991). A decision that involves a matter of trial strategy will typically not support a claim of ineffective representation. *People v. Simmons*, 342 Ill. App. 3d 185, 191 (2003). "[A] reviewing court will be highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight." *Perry*, 224 Ill. 2d at 344.

¶ 83   Here, the record shows that these points were part of defense counsel's trial strategy. Defense counsel's theory of defense at trial was that defendant's confession was the only evidence against him and it was obtained after 46 hours in custody. Defense counsel presented an alibi witness, in that Navarro testified that defendant never left the house that evening. Counsel emphasized the fact that no one identified defendant and that defendant appeared to not know certain facts of the case, such as, there was more than one shooting or whether the

firearm was a revolver or an automatic. Counsel also noted that Detective Swiderek told defendant that Flores was released after he gave a statement.

¶ 84    Defense counsel also focused on the testimony that the police had evidence implicating Flores, but not defendant. The testimony that Detective Swiderek did not have defendant's name as a suspect until Flores named him went to the theory of defense that the only evidence against defendant was his own confession. Similarly, the hearsay statements related to the police investigation of Flores, but did not involve defendant. Though defendant does not quote the specific colloquy in which defense counsel "elicited" information during his cross-examination of Detective Swiderek, the cited page in the record contains questions about the police investigation of Flores and an individual named Abraham Barajas, who was considered a suspect. It was a reasonable strategy not to object to evidence implicating Flores, but not defendant. This testimony was used by counsel to highlight the fact that defendant was not part of the police investigation until Flores implicated defendant in his own statement that defendant was the shooter and Flores was the driver. Further, the record shows that Flores's trial attorney did object to this testimony, which the trial court overruled.

¶ 85    Defendant relies on *People v. MacFarland*, 228 Ill. App. 3d 107 (1992), to support his argument. We find the case distinguishable from the instant case. In that case, the defendant argued on appeal that his nontestifying codefendant's confession was improperly admitted into evidence against him. *Id.* at 118. The reviewing court reversed the defendant's conviction and remanded for a new trial, finding that it was not harmless error to admit the codefendant's statement as direct evidence against the defendant. *Id.* at 121-23. In this case, Flores's statement was not admitted as evidence against defendant; thus, *MacFarland* is inapplicable to the facts of this case. While defendant argues that Flores's confession was introduced by defense counsel, the record shows that defense counsel only elicited testimony that Flores implicated defendant in his statement. The contents of the statement were not disclosed to the jury, let alone used as direct evidence of defendant's guilt.

¶ 86    Since the decision not to object and to present testimony relating to the police investigation of Flores was part of defense counsel's trial strategy, this claim of ineffective assistance must fail. Defendant has not shown how this trial strategy amounted to deficient performance under *Strickland*.

¶ 87    Defendant next asserts that his trial counsel was ineffective for failing to object to testimony that defendant was known as "Criminal" and "King Criminal," as well as to the admission of a MySpace photograph of a masked individual with the nickname written on it. Defendant contends that this evidence was prejudicial "because not only is the nickname menacing, there was no reason for its introduction." Defendant cites to *People v. Lindgren*, 79 Ill. 2d 129 (1980), and *People v. Harbold*, 124 Ill. App. 3d 363 (1984), for support. In *Lindgren*, the supreme court held that the defendant was denied a fair trial when testimony was admitted that he had committed an arson unrelated to the offense at trial. *Lindgren*, 79 Ill. 2d at 139-40. In *Harbold*, the defendant's right to a fair trial was violated when evidence that a firearm was found in the defendant's home was admitted at trial where the defendant was charged with homicide in the stabbing death of the victim. *Harbold*, 124 Ill. App. 3d at 384. Both cases involved the admission of irrelevant other-crime or suggestive evidence as to the defendant's criminal proclivities. That is not at issue here. The testimony regarding defendant's nickname was not evidence of other crimes just because the nickname was "Criminal." Defendant has not shown how the admission of his nickname was prejudicial such

that there was a reasonable probability that the result of the trial would have been different. Accordingly, this claim of ineffective assistance fails.

¶ 88    Next, defendant contends that although he does not believe his trial counsel opened the door to the admission of MySpace photographs, should this court find that trial counsel did open the door, such action was ineffective assistance. "[T]o the extent these were allowed into evidence due to ineffective assistance of counsel, the Defendant argues this is an additional point of error on the part of defense counsel that should result in reversal." Defendant offers no further argument on this claim of ineffective assistance of counsel and does not cite any authority. We find that defendant has forfeited this claim by failing to comply with Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2008). Supreme Court Rule 341(h)(7) requires an appellants' brief to include "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008). " '[A] reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. The appellate court is not a depository in which the appellant may dump the burden of argument and research.' " *In re Marriage of Auriemma*, 271 Ill. App. 3d 68, 72 (1994) (quoting *Thrall Car Manufacturing Co. v. Lindquist*, 145 Ill. App. 3d 712, 719 (1986)). Contentions supported by some argument, but no authority, do not meet the requirements of Supreme Court Rule 341(h)(7) (*People v. Pickens*, 354 Ill. App. 3d 904, 916 (2004)) and, therefore, defendant has forfeited this argument of ineffective assistance of counsel.

¶ 89    Next, defendant argues that his trial counsel was ineffective for failing to introduce favorable evidence that would have explained why defendant confessed and why Gonzalez implicated Flores. Specifically, defendant contends that his attorney should have attempted to introduce evidence from the ERI recordings contained on 10 DVDs. "Decisions concerning what witnesses to call and what evidence to present on a defendant's behalf are viewed as matters of trial strategy. Such decisions are generally immune from claims of ineffective assistance of counsel." *People v. Munson*, 206 Ill. 2d 104, 139-40 (2002).

¶ 90    Defendant asserts that the DVDs would have been favorable to his defense by advancing the same arguments made in his claim that his confession was not voluntary. According to defendant, the DVDs would show why defendant would have given a false confession. Defendant points to a note sent by the jury to show that he suffered prejudice. The note asked, "Are we allowed to watch the beginning of the confession when he is in the room alone?" Defense counsel stated that he believed the jury should be allowed to watch the whole confession. The State responded that the jury has the evidence before it and to continue deliberating. Over defense counsel's objection, the trial court instructed the jury, "You have received all the evidence in the court. Only that evidence is to be considered by you." Defendant argues that if the jurors had viewed the entire interrogation, then "they would have likely viewed the confession with severe skepticism and gave it the little or no weight it deserved." Defendant offers this conclusory statement without establishing how there was a reasonable probability that the result of the proceedings would have been different.

¶ 91    However, defense counsel in closing argument challenged the reliability of defendant's statement. Counsel argued that defendant was 17 and had limited contact with police. He pointed out that defendant confessed after viewing Flores's statement and Detective Swiderek's comments that after Flores confessed he was released. He also highlighted inconsistencies in what defendant said and that Detective Swiderek corrected him. Counsel

argued that defendant gave the statement because he wanted to be released and his will was overborne. Defense counsel attacked the reliability of defendant's confession based on the evidence presented. Defendant has not shown how viewing portions of the 46 hours of recordings would have created a reasonable probability that the result of the trial would have been different.

¶ 92 Defendant also contends that his trial counsel should have raised helpful testimony from Gonzalez. Specifically, defendant refers to the cross-examination of Gonzalez by Flores's attorney in which Gonzalez admitted that he picked Flores out in a lineup because Antonio showed him Flores's picture and told him that Flores was the shooter. The State responds that the decision not to raise this testimony was trial strategy. The State observes that defense counsel in his closing argument highlights that Gonzalez could only identify Flores in the lineup, but could not identify defendant. Counsel noted that Gonzalez could not identify anyone in court. Defense counsel's strategic decision not to bring out additional testimony about an identification of Flores does not constitute deficient performance.

¶ 93 Further, defendant ignores additional testimony from Antonio presented in Flores's case. Antonio specifically denied instructing Gonzalez whom to identify as the shooter. The jury in Flores's case was presented with this conflicting testimony from both witnesses. Defendant cannot contend he was prejudiced by not presenting this portion of Gonzalez's testimony without acknowledging the opposing testimony from Antonio. Defendant has not established prejudice such that there was a reasonable probability that the result would have been different.

¶ 94 Next, defendant asserts that trial counsel was ineffective for not filing a motion to suppress on the specific allegation that the recording was missing portions of the interrogation which rendered the confession inadmissible under section 103-2.1 (725 ILCS 5/103-2.1 (West 2006)). However, we have already concluded that the statement was admissible under section 103-2.1. In order to establish prejudice resulting from the failure to file a motion to suppress, a defendant must show that the motion would have been granted and that the trial outcome would have been different if the evidence had been suppressed. *People v. Patterson*, 217 Ill. 2d 407, 438 (2005). The failure to file a motion to suppress does not establish incompetent representation when the motion would have been futile. *Id*. Since we have held that the admission of the statement was proper, defendant cannot show ineffective assistance based on futile motion to suppress.

¶ 95 Defendant finally argues that his trial counsel was ineffective for failing to request a jury instruction stating that the jury could not consider the fact that defendant did not testify. Specifically, defendant asserts that his trial counsel was ineffective by not requesting Illinois Pattern Jury Instructions, Criminal, No. 2.04 (4th ed. Supp. 2009) (hereinafter, IPI Criminal 4th No. 2.04 (Supp. 2009)). IPI Criminal 4th No. 2.04 (Supp. 2009) provides, "The fact that [(a) (the)] defendant[s] did not testify must not be considered by you in any way in arriving at your verdict." The committee note states that "[t]his instruction should be given *only* at the defendant's request and, then, it *must* be given." (Emphases in original.) IPI Criminal 4th No. 2.04, Committee Note (Supp. 2009).

¶ 96 While the instruction was not requested during the instruction conference nor given to the jury before beginning deliberations, the record shows that the trial court tendered the instruction to the jury during deliberations. The record does not disclose why the instruction was given at this point.

¶ 97 The trial court made the following statement to the jury.

- 18 -

"There is an additional instruction that I need to read to you. I understand that you have reached a verdict but what I'm going to do is I'm going to read this instruction to you, I'm going to have additional jury verdict forms brought down, and I'm going to ask you to start anew and re-deliberate.

First of all, this instruction: The fact that Mr. Macias did not testify must not be considered by you in any way in arriving at your verdict.

That is the remaining instruction that I'm reading to you."

¶ 98    The jury returned to deliberate and indicated it had reached a verdict approximately 20 minutes later.

¶ 99    Defendant has cited no authority finding that a trial attorney was ineffective for either failing to request this instruction or giving the instruction after deliberations have begun. As we previously observed, Supreme Court Rule 341(h)(7) requires appellants' brief to include "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008). Contentions supported by some argument, but no authority, do not meet the requirements of Supreme Court Rule 341(h)(7) (*Pickens*, 354 Ill. App. 3d at 916) and, therefore, defendant has forfeited this argument of ineffective assistance of counsel.

¶ 100    As an alternative argument, defendant asserts that to the extent this court would find it was the trial court's responsibility to give IPI Criminal 4th No. 2.04 (Supp. 2009), then defendant was denied his right to a fair trial. Defendant again fails to offer any additional argument or citation to authority and the claim is forfeited. Forfeiture aside, we point out that the cited instruction was given to the jury and as previously discussed, the committee note indicates that the instruction is to be given when requested by defense counsel. There is no suggestion, and defendant failed to cite any authority, that the trial court errs when failing to give an optional jury instruction that was not requested during the jury instruction conference.

¶ 101    Even if defendant had not forfeited this claim of ineffective assistance of trial counsel, defendant cannot establish any prejudice when the jury received the instruction and was given time to deliberate before entering its verdict. See also *People v. Matney*, 293 Ill. App. 3d 139, 149 (1997) (Second District held that it was not error to give IPI Criminal 3d No. 2.04 over the defendant's objection and the defendant could not establish prejudice because the court could not "say that, if it were error, the error contributed to defendant's conviction, for it is presumed that the jury would understand and heed the court's directives concerning matters such as presumption of innocence, reasonable doubt, and failure to testify").

¶ 102    Next, defendant contends that he was denied a fair trial when the trial court admitted highly prejudicial photographs from a MySpace page without proper foundation or authentication. The State maintains that the photographs were properly admitted at trial.

¶ 103    The photographs were admitted at trial during the testimony of Antonio Casillas and Detective Swiderek. As previously summarized, Detective Swiderek initially testified only before defendant's jury when defendant's videotaped confession was presented. During that testimony, Detective Swiderek identified two exhibits that were photographs obtained from MySpace.com. The first photograph was given to him by another detective and showed Casillas with writing, "Little Bones Rotsk, ha, ha, ha, one less Avers." Defendant said he knew the person in the photograph as "Baby Risky," but not as "Little Bones." The second photograph was of defendant with his face blacked out. The photograph says, "Almighty

- 19 -

Drake Latin King Latin Criminal," and defendant was "throwing off gang signs." Detective Swiderek testified that he showed defendant this photograph during the interview and defendant admitted it was him. Defendant admitted that he used to be a Latin King from 27th and Drake, and he was called "Criminal." No objection was made to the admission of these photographs.

¶ 104    Later at trial, Antonio testified that he viewed a MySpace page and saw pictures of his brother and Flores. He said he recognized Flores as "Little Rowdy." He said he then looked through a Farragut High School yearbook and found "Little Rowdy" under Flores's name. Antonio viewed the MySpace pages with the help of his cousin because Antonio did not have a MySpace account. He used this account to send a friend request to "Little Rowdy." When the friend request was accepted, he was able to view photographs. Antonio testified that he approached a police officer at his brother's funeral with Flores's name. A couple days later, two detectives came to his house and Antonio showed the detectives the MySpace page.

¶ 105    Antonio was shown three photographs from the MySpace page. The first was a picture of Flores making gang signs with the caption "Lil Rowdy." The second was a photo of Casillas with a caption "Lil Bonez Rotsk," which Antonio testified meant "bragging about how [his] brother is dead." The third photo was another picture of Casillas with the caption, "Lil Bonez Rotsk!! hahaha 1 less Avers … hahaha." Antonio stated this caption was laughing and bragging about his brother's death.

¶ 106    Detective Swiderek was recalled to testify and again discussed the MySpace photographs before both juries. On cross-examination, defense counsel detailed that Antonio was able to view the MySpace photographs through his cousin. She sent a friend request to "Little Rowdy," and after it was accepted, they were able to obtain the pictures. He stated that he viewed 75 MySpace photographs. When asked if defendant was in any of the photographs, Detective Swiderek responded, "There were many." Following the detective's testimony, the trial court held that defense counsel opened the door for the admission of the MySpace photographs. Detective Swiderek testified on cross-examination that despite appearing in some of the photographs, defendant was not a suspect until Flores implicated defendant.

¶ 107    Defendant asserts that the MySpace photographs were improperly admitted without proper authentication or foundation. We considered this argument in the direct appeal of codefendant Flores. Flores's trial attorney objected to the admission of the MySpace photos, but the trial court overruled the objection, finding that the photos were not prejudicial and were relevant to the course of the police investigation. *People v. Flores*, 2014 IL App (1st) 121786, ¶¶ 67-68.

¶ 108    "The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent a showing of an abuse of that discretion." *People v. Becker*, 239 Ill. 2d 215, 234 (2010). An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful or unreasonable or where no reasonable person would agree with the position adopted by the trial court. *Id.*

¶ 109    "Under the Illinois Rules of Evidence, '[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.' " *Flores*, 2014 IL App (1st) 121786, ¶ 74 (quoting Ill. R. Evid. 901(a) (eff. Jan. 1, 2011)). "Rule 901(b) contains a nonexhaustive list of illustrations to authenticate a piece of evidence. One example from this list is testimony from a witness with knowledge that a matter is what it is claimed to be." *Id.* (citing Ill. R. Evid. 901(b)(1) (eff. Jan. 1, 2011)).

¶ 110     In *Flores*, we held that the "MySpace photographs were admitted to show the course of the police investigation. Antonio Casillas testified about how he obtained access to the photographs from the account of a friend of his cousin. His testimony authenticated that the photographs were what they were claimed to be, something used by the police during their investigation to identify [Flores] as a suspect. The photographs were not used to establish [Flores's] guilt." *Id.* ¶ 75. Similarly, in this case, the photographs were not used to establish defendant's guilt. Specifically, the testimony showed that even after viewing the photographs, defendant was not considered a suspect by the police. The photographs were relevant to show the course of the investigation, which led to Flores, who later implicated defendant. " 'In general, the consequential steps of an investigation are relevant to explaining the State's case to a jury.' " *Id.* ¶ 72 (quoting *People v. Thompson*, 2014 IL App (5th) 120079, ¶ 45, citing *People v. Johnson*, 116 Ill. 2d 13, 24 (1987)). " 'In particular, the State must be allowed to explain why a previously unidentified defendant became a suspect.' " *Id.* (quoting *Thompson*, 2014 IL App (5th) 120079, ¶ 45). We continue to follow the holding set forth in *Flores* that the MySpace photographs were admitted with proper authentication and foundation. The photographs admitted in defendant's case were not used as evidence of guilt, as the testimony showed that defendant was not considered a suspect based on the photographs.

¶ 111     Although we found that caption of the photograph of Casillas was prejudicial in *Flores*, the same concern is not present in this case. First, as we have already observed, defendant was not identified as a suspect based on the MySpace photographs, in contrast to the identification of Flores. Second, we reversed and remanded *Flores* on other grounds, and considered this issue as it would likely recur on retrial. *Id.* ¶ 79. The presence of the caption does not impact defendant's case such as to cause prejudice to defendant.

¶ 112     Defendant makes some brief statements that his trial counsel was ineffective for either failing to object to the admission of the photographs and for opening the door to the admission of additional photographs, but fails to offer any argument on this claim. As we have already observed, Supreme Court Rule 341(h)(7) requires appellants' brief to include "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008). Contentions supported by some argument, but no authority, do not meet the requirements of Supreme Court Rule 341(h)(7) (*Pickens*, 354 Ill. App. 3d at 916) and, therefore, defendant has forfeited this argument of ineffective assistance of counsel.

¶ 113     Finally, defendant argues that the trial court erred in not permitting defendant to introduce evidence from the ERI recordings to explain why he made his confession and in not tendering IPI Criminal 4th No. 2.04 (Supp. 2009) to the jury.

¶ 114     However, as the State points out, defendant fails to cite any adverse ruling from the record in which the trial court denied his request to present additional footage from the ERI recordings. Defendant simply contends that "[t]o the extent this Court may rule that this evidence was not introduced because the judge indicated her unwillingness to allow this into evidence, then the court erred in making this ruling." This contention standing alone is again insufficient under Rule 341(h)(7). Supreme Court Rule 341(h)(7) requires appellants' brief to include "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2008). Accordingly, we find this argument forfeited.

¶ 115     Based on the foregoing reasons, we affirm defendant's conviction and sentence.

¶ 116     Affirmed.