2026 IL App (1st) 240872-U

SECOND DIVISION
March 17, 2026

No. 1-24-0872

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15 CR 19470 |
| DEVION KIMBLE, | ) ) | Honorable Thomas Hennelley, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court.
Justices McBride and Ellis concurred in the judgment.

**ORDER**

¶ 1    ***Held***: We affirm defendant's convictions for first degree murder and attempted first degree murder over his contentions that (1) the State did not prove beyond a reasonable doubt that he was the perpetrator, and (2) the circuit court erred in 21 evidentiary rulings at trial.

¶ 2    Following trial, a jury found Devion Kimble guilty of first degree murder and attempted murder. The circuit court subsequently sentenced him to 85 years in prison. On appeal, Kimble

argues that the State did not meet its burden as to either first degree murder or attempted murder because it did not prove beyond a reasonable doubt that it was he who committed these offenses. Kimble also contends that the circuit court erred in numerous evidentiary rulings at trial. For the following reasons, we affirm.

¶ 3                              I. BACKGROUND

¶ 4                              A. Case Overview

¶ 5      On the afternoon of October 6, 2015, an armed individual approached the car in which Deangelo Birge and Albert Fullilove were seated. The armed individual shot and killed Birge; he also shot and severely injured Fullilove. According to the State, that armed individual was Devion Kimble.

¶ 6      Pursuant to a grand jury indictment, the State charged Kimble with the first degree murder of Birge and the attempted first degree murder of Fullilove, who testified at trial. The central issue at trial was identification of the perpetrator. Kavon Trotter, an individual who was nearby when the shooting occurred, testified before a grand jury and later at trial in this case. According to Kimble, Trotter and Fullilove were unreliable witnesses and therefore not credible; thus, the State did not meet its burden in proving Kimble was the shooter.

¶ 7      On appeal, Kimble challenges Trotter and Fullilove's testimony regarding identification, arguing that because neither witness was reliable, the State did not meet its burden. Kimble also challenges the court barring certain testimony from a detective and an expert witness. We set forth the trial evidence relevant to the issues Kimble raises on appeal.

¶ 8                              B. Albert Fullilove

¶ 9    At trial, Fullilove testified that on the afternoon of October 6, 2015, Naaja Chapman and her friend Tarsheena McIntosh picked him up from his home in a blue Ford Escape.[1] Chapman drove the three of them to purchase marijuana before returning to park near Fullilove's residence to smoke it in the car. Around the time Chapman parked near Fullilove's residence, Birge called Fullilove to say he would be joining them. Birge arrived shortly after 3:00 p.m., entered the vehicle, and sat next to Fullilove. Fullilove sat behind McIntosh, the front passenger; Birge sat behind Chapman, the driver.

¶ 10    Fullilove and Chapman were simultaneously rolling blunts when Fullilove noticed an individual walk out of a nearby alley and cross a vacant lot. The Ford escape was facing west on Maypole Avenue, and the person "was on the driver's side" of the car; that is, the individual was on the south side of the Ford Escape (Birge's side of the car). Fullilove was uncertain whether he had seen the person before, but he paid attention to him and noticed what he was wearing: beige and blue Rock Revival jeans with a black and white Brooklyn Nets jacket. Fullilove explained he was able to tell which brand of jeans the individual wore because he paid attention to detail and was "staring at him for at least 30 seconds." Fullilove testified he had 20/20 vision and saw the person's face. Fullilove further explained that his training in the army, in which he served for two years, was likely the reason for his attention to detail. He testified, "to be aware is to be alive."

¶ 11    Fullilove last observed the person as "he was stepping off the curb" onto Maypole Avenue. Fullilove did not observe anyone else with the individual outside. Fullilove turned his head toward the front of the car, heard a "bang" from the left side of the car (the same side the person had approached), and his vision went black for approximately 10 or 15 seconds. After the first shot,

---

[1] Chapman and McIntosh did not testify at trial.

his ears were ringing, and he did not hear anything until he heard Chapman and McIntosh screaming.

¶ 12     After hearing the gunshot, Birge's head was lying in his lap, and Birge was gasping for air. Fullilove noticed a gunshot hole in his own finger and blood coming down his own face. He smelled gun smoke. Chapman started the car and began driving westbound. Fullilove observed a bullet hole in Birge's head. Chapman stopped the car about three blocks down the street next to a police car that apparently was already there. Police got Fullilove out of the car, told him he had a gash on his head, and then checked on Birge. An ambulance transported Fullilove and Birge to the hospital.

¶ 13     On October 9, 2015, Fullilove was released from the hospital. The same day, Detective Katz came to Fullilove's home to speak with him regarding the shooting. Fullilove testified on cross-examination that he did not, on October 9, recall the exact brand of jeans the perpetrator was wearing, but he did note that they were "tie-dye." On October 15, 2015, Katz and another detective spoke with Fullilove at his home, this time showing him a photo array consisting of six individuals' photographs and explaining to him that the armed individual he observed the day of the shooting may not be in any of the photos.[2] Fullilove identified the first photo as the armed individual who had crossed the street and shot him and killed Birge nine days prior. Fullilove identified the person from the first photo as the same individual in court during the trial: Devion Kimble.

¶ 14     On cross-examination, Fullilove admitted to having described the shooter to detectives as a black male, approximately 5'7" to 5'9" in height, dark complexion, and aged between 17 and 21 years old. Kimble is a 5'2" black male who was 17 years old at the time of the homicide. Fullilove testified that he had a difficult time explaining to the paramedics what had just occurred because

---

[2]The other detective is Detective Duignan, whose testimony we relate below.

they had just told him he had been shot in the head. Fullilove testified that he was taking prescription medications around the time the detectives showed him the photo array on October 15, 2015.

¶ 15                                    C. Kavon Trotter

¶ 16    Kavon Trotter is an individual who lived in the area of the shooting. At the time of the homicide, Trotter was watching his daughter play outside Trotter's home. On October 15, 2015, nine days after the homicide, police executed a search warrant at Trotter's residence and recovered drugs, firearms, and a lot of ammunition. Police arrested Trotter and questioned him regarding the shooting. The following day, Trotter testified before the grand jury. The State published the following relevant portions of that grand jury testimony to the jury at trial. These are the portions of his grand jury testimony that departed from his trial testimony.

¶ 17                    1. October 16, 2015, Trotter's Grand Jury Testimony

¶ 18    Trotter testified to the grand jury that, just the day prior (October 15, 2015), he had told police that he had information regarding the October 6, 2015, homicide. Trotter did not know the shooter's birth name; rather, he knew him by his nickname "Number 2." At this point, we integrate Detective Katz's relevant trial testimony into this section because it provides the link between "Number 2" and Kimble.

¶ 19                        *Detective Katz's Trial Testimony*

¶ 20    Chicago Police Detective Adam Katz, who was assigned to this case and testified at trial, corroborated Number 2's identity during his testimony. On October 15, 2015, Katz arrived at the station where police officers had detained Trotter and learned that Trotter told them that "Number 2" perpetrated the homicide. Based on Trotter's information, Katz performed a search in the police database and found "a handful of pictures and subjects that we may have been interested in at that

point. One of them was Devion Kimble." Katz testified that he and a gang officer then drove Trotter to the neighborhood of the shooting. Trotter gave them directions to Number 2's residence, to which they drove. After pointing out the residence, Trotter identified Number 2 at the intersection of Karlov and Maypole. Because there were three or four people on the corner, Katz asked Trotter to identify Number 2 by clothing, which Trotter did. The three drove back to the police station, and at approximately 5:55 p.m. that day, a different detective showed Trotter a photo array, from which Trotter picked out a photograph of Kimble. In court, Katz, based on personal observation during the drive, identified Kimble as the person Trotter identified as Number 2 during the drive.

¶ 21                    *Trotter's Grand Jury Testimony, Continued*

¶ 22    Before the grand jury, Trotter testified that he had known Number 2 since Number 2 was a "small kid," and they both lived in the neighborhood of the shooting. Trotter had lived in that neighborhood for approximately 25 years, and he had seen Number 2 there "every day" for the past three years. Trotter described three specific occasions on which he encountered Number 2 in the neighborhood.

¶ 23    First, a couple days before the homicide, Trotter ran into Number 2 in an alley, and they spoke. Number 2 told him, "I just got robbed, and I know who did it."

¶ 24    Second, on the day of the homicide at approximately 3:16 p.m., Trotter stood on the sidewalk watching his daughter play with other children at a house three doors down from his own house on Maypole Street. There was a vacant lot adjacent to Trotter's house. Number 2 walked alone from a gangway connected to that vacant lot onto Maypole Street. Trotter noticed that Number 2 wore a black and white Brooklyn Nets "warm-up jacket." Number 2 crossed Maypole Street, and Trotter lost sight of him. Approximately 10 or 15 seconds later, Trotter heard an initial

gunshot followed by four or five more. Trotter turned toward the sound of the shots and saw Number 2 cross Maypole Street again and run back through the gangway from which he had arrived. Number 2 had one hand inside his coat. Trotter walked to investigate the crime scene and observed a parked car there.

¶ 25    Third, Trotter saw Number 2 a few days after the shooting and confronted him. Trotter told the grand jury: "When I asked [Number 2] what happened in my front house [*sic*], he said that was the person who robbed me."

¶ 26                    2. Kavon Trotter's Trial Testimony

¶ 27    At trial, Trotter testified that he did not recall the grand jury proceeding or any of the three occasions he had described to the grand jury. He denied knowing anyone nicknamed Number 2, and he denied seeing Number 2 shortly before, shortly after, and the day of the homicide. Each time Trotter denied such knowledge, the State read his grand jury testimony, which indicated he did testify to what the State described. Trotter also testified that, contrary to his grand jury testimony, he "went out to eat" in downtown Chicago with "some other people" when the homicide occurred. Trotter refused to name whom he was with that day and acknowledged he never told police this. Trotter admitted having been convicted of four felonies, including two convictions for unlawful possession of a weapon by a felon, manufacture/delivery of a controlled substance, and aggravated unlawful use or possession of a weapon. At the time of trial, Trotter was on parole for one unlawful possession of a weapon by a felon offense. Trotter testified that he understood his testimony would not impact his parole status.

¶ 28                    D. Detective Michael Duignan

¶ 29    The State called Detective Michael Duignan, who testified that he "assisted" on the investigation of the October 6, 2015, homicide with Detective Katz, but was not an investigating

detective. He acted as an independent administrator, who administered the photo arrays to both Fullilove and Trotter. Duignan explained that an independent administrator is "an investigator detective who has no involvement in the ongoing investigation and he would be unaware of any suspect that would be put into a photo array."

¶ 30    Duignan testified that he presented a photo array that "the detectives had put together" to Trotter at 5:55 p.m. on October 15, 2015. Nobody else was present, Duignan had not met Trotter before, and he did not interview Trotter about anything he knew or saw regarding the homicide. Duignan presented Trotter with a photo array advisory form, which Trotter signed. The photo array was published to the jury. Duignan testified that Trotter had circled the first photograph in the array, placed his initials there, and also made a statement that the person he circled was the homicide perpetrator. The circled photograph depicted Kimble. On cross-examination, Duignan testified that Katz created the photo array and gave it to Duignan, requesting that he present it to Trotter. The photographs were not shown one by one, but rather all on one sheet of paper.

¶ 31    Kimble also called Duignan in his case in chief. Duignan testified that he showed Fullilove the same photo array at around 6:27 p.m. on October 15, 2015. When asked whether he suggested that someone else conduct the photo array given that Duignan had already performed one with Trotter, the State objected and the court sustained. Fullilove also signed a line-up advisory form. Duignan testified that he asked Fullilove if he wanted to be videotaped, but Fullilove declined. When asked why Fullilove declined, the State objected and the court sustained. Duignan testified that he did not audio-record Fullilove either. On cross-examination, the State elicited testimony that clarified that Fullilove circled "I do not consent to being videotaped" on the advisory form Duignan gave him.

¶ 32                              E. Doctor Geoffrey Loftus

¶ 33    The defense called Dr. Geoffrey Loftus, a retired university professor who holds a Ph.D. in experimental psychology. Dr. Loftus testified that his main research area has to do with human perception, which is "the study of how people get information into their brain from the world by their sense organs, their eyes, their ears, and so on and the associated study of human memory." He had previously been qualified as an expert in human perception and memory in approximately 480 trials and hearings. The defense moved to enter Dr. Loftus's CV into evidence. The State objected to that, and the court reserved its ruling. However, the court found Dr. Loftus "to be an expert in the field of human perception and memory and may testify accordingly."

¶ 34    Using a diagram, Dr. Loftus explained in detail how memory works. The State objected to the narrative, and the court sustained, but it allowed the defense to continue asking questions about how memory works. Dr. Loftus continued to essentially lecture the jury about how memory works in humans, and the State again objected, and the court again sustained. Eventually, defense asked Dr. Loftus whether "a task such as rolling a blunt" could take someone's attention. The State objected, the court sustained, and the defense did not provide an offer of proof. The court again sustained an objection when defense asked Dr. Loftus: "if the offender were unusually short and small would that be something that would be unique that would grab the witness' attention?" The court continued to sustain similar objections throughout the testimony. At no time did the defense set forth an offer of proof.

¶ 35    On cross-examination, Dr. Loftus admitted he did not know what Fullilove observed on October 6, 2015. Dr. Loftus also agreed that he did not have personal knowledge of what Fullilove processed in his memory when he was in the car on the day of the homicide. Dr. Loftus conceded the same points regarding Trotter.

¶ 36                           F. Jury's Verdict and Post-Trial Proceedings

9

¶ 37   The jury found Kimble guilty of first degree murder and attempted first degree murder. Kimble moved for a new trial, raising the same issues he does in the instant appeal. Regarding Dr. Loftus specifically, the court stated the following:

> "The Defense repeatedly tried to inject hypotheticals and speculative questions to Dr. Loftus beyond his expertise in an attempt to cast doubt on the State's evidence. That's improper. Dr. Loftus is in no position to do something like that. In addition, these hypotheticals were peppered with some of the facts in the case. So it was a subtle way to try to have Dr. Loftus inform the jury of what he thought indirectly of what the State's witnesses did or did not see or observe. Again, all of this is improper. It's not – it's beyond what Dr. Loftus is allowed to do, and I believe my rulings on the State's objections were correct and proper at the time and nothing has caused me to disturb that. "

The circuit court denied Kimble's motion for a new trial.

¶ 38   At the sentencing hearing, the court remarked that it was "in full agreement" with the jury's decision, and "felt that the evidence in this case despite Mr. Kimble's protestations was overwhelming." The circuit court sentenced Kimble to 45 years for the first degree murder offense, to be served consecutively to a 15-year sentence for attempted murder, which included a 25-year firearm enhancement, also to be served consecutively. In total, the court sentenced Kimble to 85 years imprisonment in prison. Kimble does not challenge the sentence on appeal.

¶ 39                                II. ANALYSIS

¶ 40   On appeal, Kimble argues that (1) the State failed to meet its burden of proving beyond a reasonable doubt that he was the shooter, and (2) the circuit court abused its discretion in a multitude of evidentiary rulings that limited Dr. Loftus and Detective Duignan's trial testimony.

¶ 41                          A. Sufficiency of the Evidence

10

¶ 42    Kimble argues that the State did not prove *he* was the perpetrator beyond a reasonable doubt because both Fullilove and Trotter were unreliable witnesses. Kimble contends that the State's evidence as to the shooter's identification was insufficient; in other words, he challenges the sufficiency of the evidence.

¶ 43    In reviewing a challenge to the sufficiency of the evidence, we determine whether, viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Pizarro*, 2020 IL App (1st) 170651, ¶ 29. We do not retry the defendant; rather, we defer to the jury's evaluation of the witnesses' credibility, the weight to be given to their testimony, and the reasonable inferences to be drawn from the evidence. *Id.* The jury is in the best position to judge witnesses' credibility because it personally observes their testimony and demeanor. *Id.* The testimony of a single witness is sufficient to support a conviction if the witness's testimony is credible (*People v. Gray*, 2017 IL 120958, ¶ 36), and the State may prove its case by circumstantial evidence alone (*People v. Brown*, 2013 IL 114196, ¶ 49). We will not reverse a conviction unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Hines*, 2021 IL App (1st) 191378, ¶ 31.

¶ 44    To prove first degree murder, the State must prove beyond a reasonable doubt: (1) Kimble performed the acts that caused Deangelo Birge's death and (2) Kimble either intended to kill (or do great bodily harm) to Deangelo, knew his actions would cause such a result, or knew his actions created a strong probability of such a result. 720 ILCS 5/9-1 (West 2016). For attempted first degree murder, the State must prove: (1) Kimble, with intent to kill (or do great bodily harm) (2) shot Albert Fullilove while armed with a firearm, which constituted a substantial step toward the commission of first degree murder. 720 ILCS 5/9-1(a)(1) (West 2016). Sufficient identification

11

goes toward the first element of each offense by establishing that it was Kimble who performed the acts (here, discharging a firearm) that caused Birge's death and Fullilove's great bodily harm. Identification is the only issue on appeal related to the sufficiency of the evidence argument, so we address that portion of the first element of the above offenses.

¶ 45    Where identification is at issue in a sufficiency of the evidence claim, *Neil v. Biggers*, 409 U.S. 188 (1972), sets forth the factors relevant to evaluating eyewitness identification: (1) the witness's opportunity to view the offender at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description; (4) the witness's level of certainty; and (5) the length of time between crime and identification. *People v. Piatkowski*, 225 Ill. 2d 551, 567 (2007). These five factors guide our analysis below, beginning with Fullilove.

¶ 46                                  1. Albert Fullilove

¶ 47    As to Fullilove's testimony, Kimble takes issue with the discrepancy in the physical characteristic description Fullilove gave detectives before trial, including Fullilove's estimate that Kimble was 5'7" to 5'9" (Kimble is actually 5'2"), as well as the age estimate that Kimble was between 17 and 21 years old (Kimble was actually 17 years old). However, discrepancies in physical descriptions, including differences in height or hair length, affect the weight of the evidence rather than its legal sufficiency. See *People v. Herrett*, 137 Ill. 2d 195, 205-06 (1990) (variations in description, including height and build, were matters for the jury to resolve); *People v. Slim*, 127 Ill. 2d 302, 307-08 (1989) (inconsistencies in description of offender's height, weight, and facial hair did not render identification testimony insufficient).

¶ 48    As to height, Fullilove estimated the shooter's height to be approximately five or six inches taller than Kimble's actual height of 5'2". There are reasonable possible explanations to account for the discrepancy. We note that Fullilove observed the shooter from a distance of approximately

12

10 to 15 feet while he was seated. The jury could reasonably conclude that the height estimate was imprecise due to the fact that Fullilove was seated. Indeed, height estimations are inherently imprecise and may be affected by distance, perspective, and the stress of the event. *Slim*, 127 Ill. 2d at 311-12. The jury could also reasonably believe that Fullilove estimated Kimble to be taller because the last time Fullilove saw Kimble was when Kimble was "stepping off the curb." Curbs are usually several inches higher than street level, so standing on the sidewalk and curb could add a few inches compared to street level. This would be another reasonable conclusion. The bottom line is that this discrepancy is explicable and does not render Fullilove's testimony inherently unbelievable. *Id.* (noting decisions in which discrepancies of 7 inches did not render testimony unreliable). The discrepancy merely presents a credibility question for the jury, which is entitled to weigh the inconsistency against the witness's certainty and opportunity to observe. *Id.* at 308. We do not substitute our judgment for that of the jury. See *Brown*, 2013 IL 114196, ¶ 48.

¶ 49    In addition to the bodily characteristics discrepancy, Kimble lists five other "inconsistencies" in Fullilove's testimony.

¶ 50    First, Kimble takes issue with Fullilove testifying on direct examination that the shooter wore "beige and blue Rock Revival jeans" but admitting on cross-examination that he initially told Detective Katz that the shooter wore "tie-dye" jeans without mentioning the brand. However, tie-dye designs use multiple colors, such as beige and blue, so those descriptions are not mutually exclusive. While Fullilove did not mention the brand of jeans to Katz, an absence of detail does not amount to a contradictory statement. Thus, nothing in Fullilove's testimony contradicts his statement that the shooter wore "beige and blue Rock Revival jeans."

¶ 51    Second, Fullilove initially testified that he did not think anything of the person approaching the car because he was not doing anything unusual but later said he was paying attention to detail

13

and noticed the person's clothing and face. These statements are not necessarily inconsistent. In order to deduce that Kimble was not doing anything unusual, Fullilove had to watch him first. It is possible to pay attention without thinking anything is amiss, particularly when the observer is hyper-vigilant due to his army training.

¶ 52    Third, Fullilove identified Kimble in court but admitted during cross-examination that he did not know anything about the shooter at the time of the incident. These statements are not inconsistent. Fullilove did not need to know anything about Kimble's background at the time of the shooting to be able to see and remember his face. Fullilove had an adequate opportunity to identify the defendant, as he was paying attention to him and staring at him for 30 seconds. Fullilove's alleged lack of familiarity with Kimble's background prior to the shooting does not negate his ability to observe and recall his facial characteristics, especially given his hypervigilance based on his army training.

¶ 53    Fourth, Fullilove testified he had a clear view of the armed individual approaching the car, observed him for 30 seconds, and could see the brand of the jeans, due to his attention to detail and 20/20 vision. Kimble asserts that Fullilove "admitted he only saw the person stepping off the curb on the other side of the vehicle." This assertion is unsupported by the record. Fullilove did not admit that he "only" saw Kimble stepping off the curb. Rather, the record indicates that Fullilove stated that the "last time" he saw Kimble was when he stepped off the curb before the shooting occurred. Again, Fullilove testified that prior to that, Fullilove had watched Kimble approach the car Fullilove was seated in for "at least 30 seconds."

¶ 54    Fifth, Fullilove testified he heard a "bang" and then everything went black for 10 to 15 seconds but also stated he was aware of his surroundings and noticed the person approaching the car just before the bang. Mere chronology is not inconsistency; events happening successively

does not mean they are contradictory. The fact that, before the shooting, Fullilove was aware of his surroundings, and after the shooting, he was not for 10 to 15 seconds, does not render his testimony inconsistent as to his ability to identify the defendant.

¶ 55　Even if inconsistencies existed in Fullilove's testimony, we would defer to the jury to resolve them. See *Brown*, 2013 IL 114196, ¶ 48. The jury was in the best position to observe Fullilove testify, judge his credibility, and "draw reasonable inferences from basic facts to ultimate facts." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Again, it is not proper for us to substitute our judgment for the jury's on weight and credibility issues. *People v. Padilla*, 2023 IL App (2d) 220432, ¶ 17 ("Findings of weight and credibility are within the exclusive jurisdiction of the jury."). Moreover, as we can reasonably explain the alleged inconsistencies in Fullilove's testimony, the evidence is not so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of Kimble's guilt. See *Hines*, 2021 IL App (1st) 191378, ¶ 31.

¶ 56　　　　　　　　　　　　　　　2. Kavon Trotter

¶ 57　On appeal, Kimble raises three main issues with respect to Trotter's testimony. Kimble reminds us that Trotter denied nearly all of his grand jury testimony at trial. However, Section 115-10.1 of the Code of Criminal Procedure allows a witness's prior grand jury testimony to be used as substantive evidence when it contradicts the testimony they give at trial as long as the witness is subject to cross-examination. 725 ILCS 5/115-10.1 (West 2020); *People v. Morales*, 281 Ill. App. 3d 695, 700 (1996). Here, as in *Morales*, Kimble's trial testimony "differed dramatically" from his grand jury testimony, and he was subject to cross-examination, so his grand jury testimony could be used as substantive evidence. See *Morales*, 281 Ill. App. 3d at 700. As mentioned above, it was the jury's role to determine which testimony was credible.

¶ 58    Second, Kimble asserts that "Trotter was a five-time felon, who was arrested for possession of a weapon similar to the alleged murder weapon and who only came forward after being arrested on a narcotics warrant." As discussed above, Trotter testified as to his criminal history at trial and did not deny it, so the jury was well aware of his prior felonies. It was the jury's role to decide how Trotter's criminal history impacted his credibility, if at all. See *People v. Perez*, 2020 IL App (1st) 153629-B, ¶ 31 ("Impeachment challenges the credibility of the witness, and the trier of fact will determine what weight to give it.").

¶ 59    Third, Kimble takes issue with the fact that Trotter "only" saw Kimble right before the shooting occurred but did not actually witness the shooting. Kimble raises a similar challenge to Fullilove's testimony, so we address both together below.

¶ 60                          3. Fullilove and Trotter's Identification

¶ 61    Neither Fullilove nor Trotter testified to observing Kimble pull the trigger. However, that does not mean the State failed to meet its burden. See *People v. Cook*, 129 Ill. App. 3d 531, 534 (1984) ("A conviction may be based on entirely circumstantial evidence where the proof is conclusive and leads, on the whole, to a reasonable and moral certainty that the accused and no one else committed the crime."); *People v. Lawson*, 86 Ill. App. 3d 376, 394 (1980) (defendant was sufficiently identified when two eyewitnesses heard a shot, ran toward the sound, and saw the defendant with a gun).

¶ 62    In *Cook*, no witness testified that they saw the shooting occur, but three eyewitnesses testified to observing the defendant alone with the victim immediately before the shooting, and one of those witnesses testified to seeing the defendant leaving the crime scene with a gun in hand right after the shooting. *Cook*, 129 Ill. App. 3d at 534. The State presented evidence of the defendant's motive: the victim had beaten the defendant, and on the day of the shooting, the

defendant had threatened to "get even." *Id.* That evidence, taken together, sufficiently identified the defendant as the perpetrator. *Id. Cook* is on point here. As in *Cook*, neither Fullilove nor Trotter saw the shooting occur but they both saw Kimble immediately before (and in Trotter's case, also immediately after) the shooting. Fullilove saw Kimble approach the car shortly before being shot and indicated that no one else was on the street at that time. Trotter saw Kimble moments before the shooting, heard gunshots, and saw him running away from the crime scene with his hand tucked into his shirt, like the defendant in *Cook*. As in *Cook*, Kimble had a strong motive for retribution: Kimble believed one of the victims robbed him and, when Trotter confronted Kimble about the shooting, Kimble explicitly mentioned the robbery. Fullilove and Trotter's testimony align and reinforce each other (*e.g.*, both reported seeing Kimble in a black and white Brooklyn Nets jacket that day). See *People v. Negron*, 297 Ill. App. 3d 519, 530 (1998). Such testimony, combined with the defendant's motive, could reasonably give a trier of fact certainty that Kimble alone committed the crime.

¶ 63    Although it did not explicitly cite *Biggers*, the *Cook* court considered similar factors, and here the *Biggers* factors weigh in the State's favor. Regarding the first factor, Fullilove had ample opportunity to view Kimble while watching him approach for "at least 30 seconds," while Trotter had two opportunities to see Kimble as he proceeded to and from the crime scene. The shooting occurred in broad daylight, and Fullilove stated that nothing obstructed Kimble's face. Second, Fullilove asserted that, due this military background, he paid close attention to Kimble, such that he was able to identify which brand of jeans Kimble wore. Trotter admitted to not giving Kimble's presence much thought before the shooting occurred, but because Trotter knew Kimble since Kimble was a "small kid," he only needed a small degree of attention to identify Kimble. Third, as discussed, there is a reasonable explanation for Fullilove's initial description of the shooter's

height. Besides height, Fullilove's description of Kimble was otherwise fully accurate as to Kimble's appearance.

¶ 64    Furthermore, Trotter did not provide characteristics about the shooter that could be judged for accuracy; rather, he plainly asserted it was Kimble, which also indicates his degree of certainty. At trial, Fullilove expressed certainty that Kimble was the shooter, and though Trotter did not identify Kimble at trial, he expressed certainty while giving his sworn grand jury testimony. The jury resolved the discrepancy between Trotter's trial testimony and grand jury testimony in the State's favor. That brings us to the fifth and final factor: the length of time between the offense and the identification. Trotter identified Kimble in person and from a photo array nine days after the shooting, and a day later he identified the defendant again via photo array before the grand jury. Fullilove identified Kimble from a photo array nine days after the shooting, too. Nine days between the offense and identification falls within an acceptable range. See *People v. Johnson*, 2024 IL App (1st) 220494, ¶ 58 (eyewitness's identification of defendant from a photo array nine days after the shooting, though not ideal, fell within an acceptable range under Illinois law). Thus, all *Biggers* factors weigh in the State's favor.

¶ 65    In considering the totality of the evidence, we find that a rational trier of fact could have found that the State's evidence satisfied the elements of Kimble's convictions, including that it was, in fact, Kimble who discharged the gun that caused Birge's death and great bodily harm to Fullilove. The State proved beyond a reasonable doubt that Kimble was the shooter. Accordingly, Kimble's challenge to the sufficiency of the evidence fails.

¶ 66                                B. Evidentiary Rulings

¶ 67    Kimble argues that the circuit court abused its discretion when it barred certain testimony from Detective Michael Duignan and Doctor Geoffrey Loftus. We review the circuit court's evidentiary rulings for abuse of discretion. *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 68    Kimble's opening brief includes a numbered list of 21 bare assertions of circuit court error: eight objections to rulings on Duignan's testimony, and 13 objections to rulings on Dr. Loftus's testimony. These identical assertions are reflected in his second amended motion for a new trial that the circuit court denied. Each numbered item lists an evidentiary ruling from trial that Kimble believes was error, but it does no more than that. Kimble does not explain how or why the challenged rulings are wrong, and he does not cite any authority or include any argumentation in support of his bare assertions. There are two independent bases for why these allegations are legally insufficient for our review.

¶ 69    First, our supreme court rules require the appellant to support each allegation of error with argumentation and citation to relevant authority. Ill. S. Ct. R. 341(h)(7) (eff. July 1, 2018); *Vancura v. Katris*, 238 Ill. 2d 352, 370 (2010) ("Both argument and citation to relevant authority are required. An issue that is merely listed or included in a vague allegation of error is not 'argued' and will not satisfy the requirements of the rule.") We are not a depository into which the appellant may dump the burden of argument and research. See, *e.g.*, *McCann v. Dart*, 2015 IL App (1st) 141291, ¶ 18.

¶ 70    Second, where the circuit court sustains the State's objection and excludes defense evidence, the defendant preserves the issue by making a sufficiently specific offer of proof demonstrating the substance of the proposed testimony and the basis for its admissibility. *People v. Andrews*, 146 Ill. 2d 413, 421 (1992). A sufficient offer of proof must disclose the substance, purpose, and relevance of the excluded testimony so as to permit meaningful review and allow the

trial court an opportunity to reconsider its ruling. *People v. Landwer*, 166 Ill. 2d 475, 498 (1995); *People v. Peeples*, 155 Ill. 2d 422, 457–58 (1994). The defendant must also raise the issue in a post-trial written motion. *People v. Sebby*, 2017 IL 119445, ¶ 48. Here, although Kimble did file a post-trial motion, the list of alleged errors therein was the same as in his opening brief in this appeal: neither contains the substance, purpose, and relevance of the excluded testimony. Without knowing any of these aspects of the excluded testimony, meaningful review is not possible.

¶ 71　Even though Kimble has not explained why or how the circuit court's evidentiary hearings were wrong, we have reviewed the testimony of both Detective Duignan and Dr. Loftus, and do not find any error with the court's sustained objections regarding these testimonies. There is no indication that the court abused its discretion.

¶ 72　The only issue Kimble raises with *any* purported support is his argument that the circuit court should have granted his motion to stay his transfer from Cook County Juvenile Temporary Detention Center (CCJTDC) to Cook County Department of Corrections (CCDOC). Kimble's birth date is April 10, 1998. At the time of his arrest on October 28, 2015, Kimble was 17 years old, and he argues that he would have benefited from remaining in juvenile custody. However, on March 24, 2016, the circuit court denied Kimble's motion to stay the transfer. According to Kimble, this constituted error because had Kimble remained in juvenile custody, he would have had access to "more appropriate resources in order to navigate the judicial process."

¶ 73　Kimble has not provided a transcript of the hearing at which the court denied his motion. See *People v. Macias*, 2015 IL App (1st) 132039, ¶ 37 (as appellant, defendant has the burden to present a complete record on appeal). According to the State's brief, the circuit court heard testimony from Roosevelt Fleming, the court coordinator for the CCJTDC, who opined that Kimble should be transferred from the CCJTDC to CCDOC. The court adopted this

recommendation. However, as we do not have the transcript of the hearing, we do not know the court's reasoning, and therefore, we cannot determine whether it erred.

¶ 74    Moreover, this argument is based on vague speculation: that Kimble would have had more appropriate resources had he remained in juvenile custody. He does not explain what these resources would have been, or, more importantly, if and how they would have benefited his defense. *Id.* ("[A]ny doubts arising from an incomplete record will be construed against defendant."). We do know that Kimble has had counsel not only in this appeal, but also during the trial and post-trial proceedings, so to the extent he suggests that he did not have access to counsel or that his counsel was ineffective, his assertion has no basis. Thus, we find Kimble's argument without merit.

¶ 75                                    III. CONCLUSION

¶ 76    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 77    Affirmed.